State ex rel. Weiss and others vs. District Board, etc.

was to be weighed with the testimony on the part of the defendant, and that they were only to find for the former in case his evidence outweighed the evidence of the latter.

The other errors assigned either fall with the conclusions already reached, or are so manifestly unfounded as not to require particular mention.

*By the Court.*— The judgment of the circuit court is affirmed.

A motion for a rehearing was denied March 18, 1890.

=========

THE STATE EX REL. WEISS and others, Appellants, vs. THE DISTRICT BOARD OF SCHOOL DISTRICT NO. EIGHT OF THE CITY OF EDGERTON, Respondent.

76 177
83 142
76 177'
94 266

76 177
115 42
59 LRA 930

*February 4 — March 18, 1890.*

*Constitutional law: Common schools: Bible reading: "Sectarian instruction:" Maintenance of "place of worship:" "Religious seminaries:" Ordinance of 1787.*

1. In a petition by residents and tax-payers of a city for a writ of *mandamus* to compel the discontinuance of the practice of reading the Bible in the public schools therein, averments that the residents of said city, who are taxed for the support of said schools, are equally entitled to the benefits thereof, by having their children instructed therein according to law, and that the reading complained of is contrary to the rights of conscience, and in violation of law, and is sectarian instruction and in violation of sec. 3, art. X, Const., are *held* sufficiently broad to cover any valid objection which may be made to such reading.

2. Averments in the return to the alternative writ that the reading of the Bible in schools is not sectarian instruction, and that the school board has lawful right to permit, but none to prevent, such reading,— being mere legal conclusions, are not admitted by a demurrer.

3. Nor does the demurrer admit an averment in such return that there is no material difference between the King James version of the

State ex rel. Weiss and others vs. District Board, etc.

Bible, used in the schools, and the Douay version,— such averment being against common knowledge, and therefore not well pleaded.

4. The courts will take judicial notice of the contents of the Bible, that the religious world is divided into numerous sects, and of the general doctrines maintained by each sect.

5. The whole Bible, without exception, having been designated as a text-book for use in a school, and it being claimed by the school board that the whole contents thereof may lawfully be read in such school if the teachers so elect, the Bible will be regarded as a whole in determining whether such reading is sectarian instruction; and it is immaterial that the only portions thereof thus far read in such school are not sectarian.

6. The use of any version of the Bible as a text-book in the public schools, and the stated reading thereof in such schools by the teachers, without restriction, though unaccompanied by any comment, has "a tendency to inculcate sectarian ideas," within the meaning of sec. 3, ch. 251, Laws of 1883, and is "sectarian instruction," within the meaning of sec. 3, art. X, Const.

7. But text-books founded upon the fundamental teachings of the Bible or which contain extracts therefrom, and such portions of the Bible as are not sectarian, may be used in the secular instruction of the pupils and to inculate good morals.

8. The fact that the children of the petitioners are at liberty to withdraw from the school-room during the reading of the Bible does not remove the ground of complaint.

9. The constitutional prohibition of sectarian instruction being unambiguous, the rules as to interpretation in the light of surrounding circumstances when it was framed and adopted, and as to the authority of contemporaneous exposition, are not controlling.

10. Considered in the light of prior and contemporaneous history, the provisions of our constitution herein cited were manifestly intended to prohibit practices then permitted by other constitutions.

11. The stated reading of the Bible as a text-book in the public schools may be "worship," and the school-house thereby become, for the time being, a "place of worship," within the meaning of sec. 18, art. I, Const.; and to such use of the school-house the tax-payers, who are compelled to aid in its erection and in the maintenance of the school, have a legal right to object.

12. Children of poor parents, who are by law practically obliged to attend the public schools, would, if such reading were permitted, be compelled to attend a place of worship, contrary to said sec. 18.

13. Such reading being religious instruction, the money drawn from the state treasury for the support of a school in which the Bible is

State ex rel. Weiss and others vs. District Board, etc.

so read, is for the benefit of a "religious seminary," within the meaning of said section.

14. By the adoption of the state constitution and the admission of the state into the Union, the third of the articles of compact in the Ordinance of 1787 ceased to be longer in force.

APPEAL from the Circuit Court for *Rock* County.

The relators filed their petition in the circuit court for Rock county, praying that a writ of *mandamus* issue to the district board of school district No. 8 of the city of Edgerton, in said county, commanding said board to cause the teachers in the public schools of that district to discontinue the practice, which had theretofore prevailed, of reading therein selections from the Bible. The petition is as follows:

"The petition of *Frederick Weiss, W. H. Morrissey, Thomas Mooney, James McBride, J. C. Burns,* and *John Corbett* respectfully shows unto this court that your petitioners are, and for many years last past have been, residents and tax-payers of the city of Edgerton, in Rock county, Wis.; that there are in said city of Edgerton, kept and maintained in accordance with and in pursuance of the Revised Statutes of said state of Wisconsin, certain free common schools; that the residents of said city of Edgerton, who are taxed for the support of said schools, are equally entitled to the benefits thereof by having their children instructed therein according to law; that your petitioners are parents of children, which children they are desirous of having educated in said schools; that said children of your petitioners respectively, to wit, Annie Mooney, Ettie Weiss, Thomas Burns, Nora Corbett, Bessie Corbett, Katie Corbett, Annie McBride, Jane McBride, and James McBride, are pupils of and attend said schools for the purpose of receiving instruction.

"Your petitioners further show that certain of the teachers employed by the district board having charge of said schools to conduct the same and instruct the pupils attending said schools, read to said pupils, and, among them, the children of your petitioners above named, each and every day when said schools are in session, and during the hours fixed for the instruction of pupils, certain portions of the book commonly known as the 'Bible;' said teachers themselves selecting the portion so read, and uniformly using in such reading the translation of said Bible known as the 'King James Version.' That such reading, as above set forth, was and is a custom followed by certain of said teachers in said schools.

State ex rel. Weiss and others vs. District Board, etc.

"Your petitioners further show that they, and many others of the residents and tax-payers of said city and school district, whose children attend said schools and are under the control and are instructed by the teachers above named, and who are lawfully entitled to the equal benefits of said schools, are, together with their said children, members of the Roman Catholic Church, and conscientiously believe its doctrines, faith, and forms of worship; and that by said church the version of the Scriptures referred to in this petition is taught and believed to be incorrect as a translation, and incomplete, by reason of the omission of a part of the books held by such church to be integral portions of the inspired canon; and it is further taught by the said Roman Catholic Church, and believed by its members, that the Scriptures ought not to be read indiscriminately, inasmuch as said church has divine authority as the only infallible teacher and interpreter of the same, and that the reading of the same without note or comment, and without being expounded by the only authorized teachers and interpreters thereof, is not only not beneficial to the children in said schools, and especially to the above-named children of your petitioners, who are members of said church, but likely to lead to the adoption of dangerous errors, irreligious faith, practice, and worship; and that by reason thereof the practice of reading the King James version of the Bible, commonly and only received as inspired and true by the Protestant religious sects, is regarded by the members of said Roman Catholic Church, among whom are your petitioners, as contrary to the rights of conscience, and as wholly contrary to and in violation of the law; and that your petitioners believe such exercises as are above set forth, and each and all of them, to be sectarian instruction, and in violation of section 3, article X, of the constitution of the state of Wisconsin.

"Your petitioners further show that they, with others of said residents and tax-payers of said city and school district, have petitioned and requested said board, having the control and management of said schools, to interfere, as they lawfully might and should do, and to direct said teachers to discontinue the unlawful and wrongful practices and exercises above set forth, and to confine the instruction to be given by such teachers to the studies and branches of knowledge lawfully provided for the said pupils; but that said board has wholly neglected and refused, and still does wholly neglect and refuse, to in any way interfere in said matter, and has and does wholly refuse to perform the duties legally devolving upon it, and has and does now permit said above-mentioned exercises to be carried on as above set forth.

"Wherefore your petitioners pray that a writ of *mandamus* may issue from said court to said district board, commanding said board to cause said teachers to discontinue the practices and exercises above set forth."

Upon such petition an alternative writ of *mandamus* was issued and served, to which the district board made return as follows:

"The answer of the district board of school district number eight of the city of Edgerton, to the amended alternative writ of *mandamus* issued by the circuit court for Rock county in the above-entitled action.

"The district board of school district number eight of the city of Edgerton, for return and answer to the amended alternative writ of *mandamus* issued in the above-entitled action, admit that the said *Frederick Weiss, W. H. Morrisey, Thomas Mooney, James McBride, J. C. Burns,* and *John Corbett* are, and for many years have been, residents and taxpayers of the city of Edgerton; that there is in said city of Edgerton, kept and maintained in accordance with and in pursuance of the statutes of the state of Wisconsin, a free common school; that the residents of the city of Edgerton taxed for the support of said school, and having children to be instructed therein, are entitled to the benefits of such school; that the petitioners, *Frederick Weiss, Thomas Mooney, James McBride, J. C. Burns,* and *John Corbett,* are parents of children, which they are desirous of having educated in said school; that the children named in said amended alternative writ are pupils of and attend said school for the purpose of receiving instruction therein.

"The said district board, further answering the allegations of said amended alternative writ, admits that two of the teachers employed by said district board, and having charge of two of the departments in said school, did, prior to the filing of this petition of the relators of this action, read to the pupils in their departments daily, when said school was in session, portions of the book known as the 'Bible;' that said teachers selected the portions of the Bible so read by them; that these selections so read were made from the translation of the Bible known as the 'King James Version,' and that some of the children whose names are set forth in the said amended alternative writ attended and received instruction in the departments of said school in which such selections from the Bible were so read; but said board allege that the children of said petitioners were not, and are not, required to remain in said school during the reading of such portions of the Bible, but are at liberty to withdraw during such reading if they desire so to do.

"The said district board, further answering the allegations of said alternative writ, deny that selections from the Bible were read by all of the teachers in said school, or that such selections were read in all the departments of said school.

"The said district board, further answering the allegations of said amended alternative writ, admit that the petitioners above named, to-

gether with the children in said alternative writ named, were and are members of the Roman Catholic Church; that they believe in the doctrines, faith, and forms of worship of the Roman Catholic Church, and that by said Roman Catholic Church the translation of the Bible known as the 'King James Version' is believed to be incorrect as a translation, and incomplete, by reason of the omission of certain books held by said church to be integral portions of the inspired canon.

"The said district board, further answering the allegations of said amended alternative writ, admits that it is taught by said Roman Catholic Church, and believed by some of its members, that the Scriptures ought not to be read indiscriminately, that said Roman Catholic Church has divine authority as the only infallible teacher and interpreter of the scriptures, and that the reading of the same without note or comment, and without being expounded by the only authorized teacher and interpreter thereof, is not only not beneficial to children, but likely to lead to the adoption of dangerous errors, irreligious faith, practice, and worship; and that by reason thereof the practice of reading the King James version of the Bible is regarded by some of the members of the Roman Catholic Church, and by the petitioners above named, as contrary to the rights of conscience, and as contrary to and in violation of law; and that the petitioners above named believe the reading of the King James version of the Bible, as set forth in said amended alternative writ, to be sectarian instruction, and in violation of section 3, article X, of the constitution of the state of Wisconsin.

"But said district board, further answering the allegations of said amended alternative writ, upon information and belief deny that the Roman Catholic Church is the only infallible teacher or interpreter of the Bible; but, on the contrary, said board allege, upon information and belief, that every person has the right to read the Bible and interpret it for himself; that the claim of the relators in that regard is sectarian; and that an enforcement thereof would be a violation of the constitution of this state.

"The said district board, upon information and belief, further deny that the reading of selections from the King James version of the Bible, as alleged in said alternative writ, is contrary to the rights of conscience or in violation of law, or that the same is sectarian instruction, or in violation of section 3 of article X of the constitution of this state, or of any provision or requirement of said constitution or of the statutes or the common law of this state; and the said board, upon information and belief, deny that the reading of such selections from the Bible by some of the teachers in said school, in some of the departments thereof, as the same were in fact read, was contrary to or in violation of law, or that the same was or is sectarian instruction, or that the same was or is

in violation of section 3 of article X of the constitution of this state, or that the same was or is in violation of any provision or requirement of the constitution or the statutes or the common law of this state.

"The said district board, further answering the allegations of said amended alternative writ, admits that they have permitted, and now do permit, some of the teachers in some of the departments of said schools to read, without comment, selections made by such teachers from the King James version of the Bible; and said board, upon information and belief, allege that they have the lawful right to permit such selections to be made and read by some of said teachers in some of the departments of said school.

"The said district board, further answering the allegations of said amended alternative writ, upon information and belief allege that they have no lawful right or authority to require the teachers in said school to discontinue the reading of selections from the Bible in said school; and that therefore they ought not and cannot lawfully require said teachers to discontinue the reading of selections from the Bible in some of the departments in said school.

"II. The said district board, for a further answer and return to the allegations of the amended alternative writ issued by said court in this action, admit that the petitioners named in said writ, with their children, are members of the Roman Catholic Church, and that they believe that the translation of the Bible known as the 'King James Version' is incorrect as a translation, and incomplete, by reason of the omission of a portion of the books held by the Roman Catholic Church to be integral portions of the inspired canon. But the said district board, upon information and belief, allege that the said Roman Catholic Church do also believe and teach that the translation of the Bible known as the 'Douay and Rheims Version,' and commonly called the 'Douay Version,' is correct and complete; that said church, and the members thereof, constantly use said Douay version in the worship conducted in and by said church. And said board, upon information and belief, allege that said translation of said Bible known as the 'King James Version' contains no book, or part of book, not contained in the translation known as the 'Douay Version;' that the King James version and the Douay version are different translations of the same Bible; that there is no material difference in said translations; that, while the selections from the Bible read by the teachers in the school of said district were read from the King James version, the portions and passages so read are contained in the Douay version, and were not, and are not, materially different from the translation of the same portions and passages of the Bible in the Douay version, used by said Roman Catholic Church.

"The said district board, upon information and belief, further show

that the following are the only portions of said Bible so selected by the said teachers in said school, and read therein, and that the same were read from the King James version of said Bible."

Quotations from the scriptures are inserted in the answer, consisting of the 1st, 15th, 19th, 23d, 24th, 27th, 37th, 46th, 100th, 121st, 125th Psalms; the 1st, 3d, 13th, 16th, and 20th verses of chapter 15 of the Book of Proverbs; the 16th, 20th, and 22d chapters of Proverbs; the 2d chapter of Matthew; the 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, and 13th verses of the 5th chapter of Matthew; the 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th verses of the 6th chapter of Matthew; the 13th chapter of Matthew; the 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 16th, 17th, 18th, 19th, 20th, 21st, 22d, 23d, 24th, 25th, 26th, 27th, and 28th verses of the 25th chapter of Matthew; the first 14 verses of the 11th chapter of Luke; the first 28 verses of the 19th chapter of Luke; the first 5 verses of the 21st chapter of Luke; the 4th, 5th, 6th, 7th, and 8th verses of the 14th chapter of Romans; and the 13th chapter of 1st Corinthians.    The answer then proceeds as follows:

"This said district board, upon information and belief, further allege that the portions of the Bible above set forth, and so selected by said teachers and read in said schools as aforesaid, were not and are not sectarian; that the reading of those portions of the Bible above set forth was not and is not sectarian instruction; that the reading of the portions of the Bible above set forth was not and is not contrary to the rights of conscience, nor in violation of section 3 of article X of the constitution, or the statutes, or the common law of this state; and that said section 3 of article X of the constitution was not intended by the people of said state, when said constitution was adopted, to prohibit the reading of the Bible in the schools of said state, and does not prohibit the reading of the Bible in such schools.

"III. The said district board, for a further answer and return to the amended alternative writ issued by said court in this action, respectfully shows that prior to and at the time of the filing of the petition of the relators in this action, said school district number eight was duly formed and organized as a school district under and in pursuance of the

State ex rel. Weiss and others vs. District Board, etc.

laws of this state; that prior to the time of the filing of said petition the said school district owned and maintained a school-house in said district; that prior to the time of filing such petition a school, with different departments therein, was maintained and taught in said school-house under the direction of said district board; and that such school was being maintained and taught in said school-house at the time of the filing of the petition of the relators herein.

"The said district board further show that, prior to the time of filing said petition, the district board of said school district had the right and authority to determine what school and text books should be used in the several branches of study pursued in the school of said district; that, prior to the filing of said petition, the said district board, in pursuance of their authority, decided and determined what school and text books should be used in the school in said district, and made a list of such books, and adopted the same as the books to be used in said district, in the manner required by law; that such list was and is as follows: [Here follows a list of such text-books, one of which is the Bible.]"

## The return then goes on to its close as follows:

"The said district board further show that the translation of the Bible selected and included in said list of text and school books, and adopted by said board, was and is the version thereof known as the 'King James Version,' and that the readers so selected and included in said list, and adopted by said board, contain many selections from the King James version of the Bible.

"The said district board further show that said King James version of the Bible was so selected by said board, and included in said list of text-books, and adopted by said board, for the purpose of being used in the general education of the scholars attending said school, and not for sectarian instruction.

"The said district board further show that, when a list of text-books has been made by it, it is by the statutes of this state prohibited from making any changes in said list for the term of three years; that it cannot make any change in said list until after the expiration of three years, without the consent of the state superintendent; and that three years have not elapsed since said list of text-books was so made by said district board.

"The said district board, upon information and belief, further show that prior to the time of the reading of the Bible in the school of said district, and prior to the adoption of said list of text-books by said district board, as aforesaid, the superintendent of public instruction in

said state of Wisconsin recommended for adoption and use in the schools of said state a list of text-books; that in such list of text-books so recommended by said state superintendent, and as a part thereof, is the King James translation of the Bible; and that such recommendation has not been in any way revoked or withdrawn, but still remains in full force.

"The said district board, for a further return and answer to the amended alternative writ issued in this action, allege that said school district was, long prior to the reading of the Bible as mentioned in the petition of the relators, duly formed and organized as a school district under and in pursuance of the statutes of this state; that the members of said district board were duly elected and qualified as required by law; that, as members of such board, they entered upon the discharge of their duties and the performance of the trusts reposed in them as members of such board; that the school in said district is established and maintained for the benefit and advantage of all of the children residing in said district between the ages of four and twenty years; that there are residing in said school district, in addition to the children named in the petition of the relators, about five hundred children, a small proportion of whom are children of Catholic parents or members of the Roman Catholic Church, but nearly all of whom are children of Protestant parents; that such school is established and maintained for the purpose of giving and securing to all of the children within the ages aforesaid, residing in said district, as complete an education as the educational facilities of said district will permit; that it is the duty of said district board to so maintain, conduct, and control said school that every child within the ages aforesaid, residing in said district, shall have the advantage of every educational facility that may be afforded by said school; that the Bible is an important text-book in said school; that there is no book known to said board that can be used as a text-book in said school which will take the place of the Bible in said school; that the reading of the Bible to the children attending said school at suitable and proper times is an important part in the education of the children attending said school; that the parents of the children in said district, with the exception of the petitioners and a very few others, desire that the King James translation of the Bible be used as a text-book in said school; that the reading of the Bible in said school is not in any way sectarian instruction in said school, and is not in any way prohibited by the constitution or the laws of this state.

"And the said board, upon information and belief, further allege that it is the duty of said board to require said Bible to be used in said school as a text-book at suitable and proper times, when the use thereof will aid in the education of the children attending said school; and that

said board has no right to prohibit, and should not attempt to prohibit, the use of the Bible in said school at proper and suitable times, when such use will aid in making more complete the education of the children attending said school. And said board submits that for the reasons above set forth they ought not to discontinue the use of the Bible in the school of said district, and that they have no right nor authority to discontinue such use of the Bible in said school.

" Wherefore said board pray the judgment of this court denying the prayer of the petition of the relators, and that said board recover their costs and disbursements in this action."

The petitioners interposed a general demurrer to such answer and return, and the same was overruled by the court. The petitioners appealed to this court from the order overruling the demurrer.

For the petitioners there were briefs by *Winans & Hyzer*, attorneys, and *J. H. M. Wigman* and *Humphrey J. Desmond*, of counsel, and the cause was argued orally by *John Winans, J. H. M. Wigman*, and *Humphrey J. Desmond*.

For the respondent there was a brief signed by *J. P. Towne* and *A. A. Jackson*, and oral argument by *Mr. Jackson*.

[The arguments of counsel being in large measure historical in their nature or relating to the differences between versions of the Bible, it has been found impossible to do even approximate justice to their elaborate and able briefs in the space which could properly be allotted thereto.]

LYON, J. The petitioners are residents and tax-payers of the city of Edgerton, and their children are pupils in the public schools of that city. They allege in their petition that certain of the teachers, employed by the district board having charge of such schools, read daily to the pupils therein, during school hours, certain portions of King James' version of the Bible, selected by the teachers; and that the petitioners have requested the district board to require the teachers to discontinue such practice, but the board refuses to do so. The petitioners further allege that

such practice is a violation of certain provisions of the constitution of this state, hereinafter more particularly mentioned, and pray that a writ of *mandamus* may issue from the circuit court to the school board, commanding such board to cause the teachers to discontinue the practice and exercises complained of.

Upon the filing of such petition in the circuit court, the usual alternative writ of *mandamus* was issued and served upon the school board. The board made return to such writ by filing an answer to the petition, admitting the existence of the practice complained of and the refusal of the board to cause it to be discontinued, denying the authority of the board to interfere with the practice, and alleging that the practice is legal and proper, and that the Bible is a duly authorized and selected text-book for use in said schools. Further statement of the contents of the petition and answer is hereinafter made. The petitioners demurred to the answer of the school board, alleging, as ground of demurrer, that the answer fails to state facts showing that a peremptory writ of *mandamus* as prayed should not issue. The circuit court overruled the demurrer, and the petitioners appealed to this court from the order in that behalf.

The questions which must be adjudicated on this appeal have been argued by the respective counsel with great ability, and with all the earnestness of intense personal conviction. The arguments and the opinion of the learned circuit judge, overruling the demurrer to the answer of the respondent, show great learning and historical research, and have been valuable to us in our deliberations upon the case.

The constitutional objections urged by the petitioners to the reading of the Bible in the district schools are that (1) it violates the rights of conscience; (2) it compels them to aid in the support of a place of worship against their consent (sec. 18, art. I, Const.); (3) it is sectarian instruction (Const. art. X, sec. 3).

This opinion will be confined quite closely to a discussion

of the question whether the adoption of the Protestant, or King James, version of the Bible, or any version thereof, in the public schools in the city of Edgerton, as a text-book, and the reading of selections therefrom in those schools at the times and in the manner stated in the answer, is sectarian instruction, within the meaning of that term as used in sec. 3, art. X, of the constitution, which ordains that no sectarian instruction shall be allowed in the district schools of this state.

1. Some questions as to the effect of the demurrer upon certain allegations in the answer of the respondent to the petition for a writ of *mandamus* will first be considered. It is a familiar rule that a demurrer to any pleading reaches back through the whole record, and seizes hold of the first defective pleading. In this case the petition for a writ of *mandamus*, and the answer of the school board thereto, constitute the pleadings. Hence, if the petition is insufficient, judgment on the demurrer to the answer should go for the respondent, although the answer may also be insufficient. This rule is invoked by the learned counsel for the respondent.

It best comports with the gravity and importance of the case to fully consider and determine it upon the merits, to the end that the controversy which has grown out of the practice complained of be put at rest in this state. Hence no narrow or technical construction of the pleadings should prevail which will defeat or postpone a final adjustment of the controversy.

The petitioners are members of the Roman Catholic Church and believers in its doctrines. Hence it is quite natural that most of the averments in their petition should be made, as they in fact are, from the stand-point of such doctrines. But should it be held that members of that church have no valid grounds, as such, for their objections to the reading of the Bible in the district schools, still the

petition contains general averments sufficiently broad to cover any valid objection to such reading which might be made by any citizen of the state aggrieved by the action of the school board.   These averments are " that the residents of said city of Edgerton, who are taxed for the support of said schools, are equally entitled to the benefits thereof, by having their children instructed therein according to law;" and that such reading of the Bible "is contrary to the rights of conscience, and wholly contrary to and in violation of the law; and that your petitioners believe such exercises as above set forth, and each and all of them, are sectarian instruction, and in violation of section 3, article X, of the constitution of the state of Wisconsin."

The answer contains several averments which counsel claim are admitted by the demurrer, but which are mere legal conclusions from facts stated therein ; such as that the reading of the Bible in schools is not sectarian instruction, or that the school board have lawful right to permit, and none to prevent, such reading of the same.   Averments of this kind or of facts not well pleaded are not admitted by a general demurrer to the pleading.   5 Am. & Eng. Ency. of Law, 551, and cases cited in note 6.

It is averred in the return that there is no material difference between the King James version of the Bible, used in the Edgerton schools, and the Douay version, which is the only one recognized by the Catholic Church as correct and complete.   It is universally known that there are differences between these two versions in many particulars which the respective sects regard as material.   Hence the averment is against common knowledge, and therefore not well pleaded.

Our conclusion is that if such reading of the Bible is sectarian instruction, or if it violates any other constitutional right of any citizen or sect, the petition is sufficient.

2. In considering whether such reading of the Bible is

sectarian instruction, the book will be regarded as a whole, because the whole Bible, without exception, has been designated as a text-book for use in the Edgerton schools, and the claim of the school board is substantially (although perhaps not in terms) that the whole contents thereof may lawfully be so read therein, if the teachers so elect. This being so, it is quite immaterial if the portions thereof set out in the return as the only portions thus far read are not sectarian. Yet it should be observed that some of the portions so read seem to inculcate the doctrines of the divinity of Jesus Christ and the punishment of the wicked after death, which doctrines are not accepted by some religious sects.

3. The courts will take judicial notice of the contents of the Bible, that the religious world is divided into numerous sects, and of the general doctrines maintained by each sect; for these things pertain to general history, and may fairly be presumed to be subjects of common knowledge. 1 Greenl. Ev. §§ 5, 6, and notes. Thus they will take cognizance, without averment, of the facts that there are numerous religious sects called " Christians," respectively maintaining different and conflicting doctrines; that some of these believe the doctrine of predestination, while others do not; some the doctrine of eternal punishment of the wicked, while others repudiate it; some the doctrines of the apostolic succession and the authority of the priesthood, while others reject both; some that the Holy Scriptures are the only sufficient rule of faith and practice, while others believe that the only safe guide to human thought, opinion, and action is the illuminating power of the divine spirit upon the humble and devout heart; some in the necessity and efficacy of the sacraments of the church, while others reject them entirely; and some in the literal truth of the scriptures, while others believe them to be allegorical, teaching spiritual truths alone or chiefly. The courts will

also take cognizance of numerous other conflicts of doctrine between the sects; also that there are religious sects which reject the doctrine of the divinity of Christ, among which is the Hebrew or Jewish sect, which denies the inspiration and authority of the New Testament; and, further, that the sect known as the "Latter Day Saints," or "Mormons," while accepting the Bible, is reputed to believe the Book of Mormon, and the deliverances of its own alleged prophets, to be of equal authority therewith. Many, if not most, of the above sects include within their membership citizens of Wisconsin. A great majority, if not all, of them base their peculiar doctrines upon various passages of Scripture, which may reasonably be understood as supporting the same.

It should here be said that the term "religious sect" is understood as applying to people believing in the same religious doctrines, who are more or less closely associated or organized to advance such doctrines and increase the number of believers therein. The doctrines of one of these sects which are not common to all the others are sectarian; and the term "sectarian" is, we think, used in that sense in the constitution.

4. Counsel for the school board maintain, in their argument, that the Christian religion is part of the common law of England; that the same was brought to this country by the colonists, and by virtue of the various colonial charters was embodied in the fundamental laws of the colonies; that this religious element or principle was incorporated in the various state constitutions, and in the Ordinance of 1787 for the government of the Northwest Territory, by virtue of which ordinance it became the fundamental law of the territory of Wisconsin. Numerous quotations are given by him from the above documents, from the utterances of Congress and legislatures, and from the writings of our early statesmen, to prove these propositions. That

the learned counsel have fairly demonstrated their accuracy is freely conceded. More than that, counsel have proved that many, probably most, of those charters, and some of the state constitutions, not only ordained and enforced some of the principles of the Christian religion, but sectarian doctrines as well.

They have also attempted, at considerable length, to show that the Church of Rome is hostile to our common-school system. This court neither affirms nor denies the accuracy of this position. Moreover, counsel on both sides have argued, to some extent, as to whether certain religious dogmas are true or false.

None of these matters are material or pertinent to the questions to be determined on this appeal. This case must be decided under the constitution and laws of this state now in force; and it is entirely immaterial to the decision thereof whether the interference of the courts to compel a faithful execution of the law by school-boards is invoked by those who are hostile or friendly to our common-school system. The question is, What is the law of the case? not what opinions are entertained by those who demand its enforcement? It is scarcely necessary to add that we have no concern with the truth or error of the doctrines of any sect. We are only concerned to know whether instruction in sectarian doctrines has been, or, under existing regulations, is liable to be, given in the district schools of the state, and especially in the public schools of the city of Edgerton.

5. We come now to the more direct consideration of the merits of the controversy. The term " sectarian instruction," in the constitution, manifestly refers exclusively to instruction in religious doctrines, and the prohibition is only aimed at such instruction as is sectarian; that is to say, instruction in religious doctrines which are believed by some religious sects and rejected by others. Hence, to teach the

existence of a Supreme Being, of infinite wisdom, power, and goodness, and that it is the highest duty of all men to adore, obey, and love Him, is not sectarian, because all religious sects so believe and teach. The instruction becomes sectarian when it goes further, and inculcates doctrine or dogma concerning which the religious sects are in conflict. This we understand to be the meaning of the constitutional prohibition.

That the reading from the Bible in the schools, although unaccompanied by any comment on the part of the teacher, is "instruction," seems to us too clear for argument. Some of the most valuable instruction a person can receive may be derived from reading alone, without any extrinsic aid by way of comment or exposition. The question, therefore, seems to narrow down to this: Is the reading of the Bible in the schools — not merely selected passages therefrom, but the whole of it — sectarian instruction of the pupils? In view of the fact already mentioned, that the Bible contains numerous doctrinal passages, upon some of which the peculiar creed of almost every religious sect is based, and that such passages may reasonably be understood to inculcate the doctrines predicated upon them, an affirmative answer to the question seems unavoidable. Any pupil of ordinary intelligence who listens to the reading of the doctrinal portions of the Bible will be more or less instructed thereby in the doctrines of the divinity of Jesus Christ, the eternal punishment of the wicked, the authority of the priesthood, the binding force and efficacy of the sacraments, and many other conflicting sectarian doctrines. A most forcible demonstration of the accuracy of this statement is found in certain reports of the American Bible Society of its work in Catholic countries (referred to in one of the arguments), in which instances are given of the conversion of several persons from "Romanism" through the reading of the Scriptures alone; that is to say, the reading

of the Protestant or King James version of the Bible converted Catholics to Protestants without the aid of comment or exposition. In those cases the reading of the Bible certainly was sectarian instruction. We do not know how to frame an argument in support of the proposition that the reading thereof in the district schools is not also sectarian instruction.

It should be observed, in this connection, that the above views do not, as counsel seemed to think they may, banish from the district schools such text-books as are founded upon the fundamental teachings of the Bible, or which contain extracts therefrom. Such teachings and extracts pervade and ornament our secular literature, and are important elements in its value and usefulness. Such text-books are in the schools for secular instruction, and rightly so; and the constitutional prohibition of sectarian instruction does not include them, even though they may contain passages from which some inferences of sectarian doctrine might possibly be drawn.

Furthermore, there is much in the Bible which cannot justly be characterized as sectarian. There can be no valid objection to the use of such matter in the secular instruction of the pupils. Much of it has great historical and literary value, which may be thus utilized without violating the constitutional prohibition. It may also be used to inculcate good morals,— that is, our duties to each other,— which may and ought to be inculcated by the district schools. No more complete code of morals exists than is contained in the New Testament, which reaffirms and emphasizes the moral obligations laid down in the ten commandments. Concerning the fundamental principles of moral ethics, the religious sects do not disagree.

6. It is urged on behalf of the school board that the constitution must be interpreted in the light of the surrounding circumstances existing when it was framed and adopted,

and that contemporaneous exposition thereof is of great authority. Cases in this court and elsewhere are cited to these propositions. Undoubtedly they are correct rules of interpretation, applicable alike to constitutions, statutes, and all written instruments, where the language employed is of uncertain import; but if the words of the instrument are unambiguous there is no room for construction outside the words themselves, and the above rules cease to be controlling or important. It is proper, however, to consider the constitutional prohibition in the light of such rules of interpretation.

On the subject of contemporaneous exposition, counsel refer us to the uniform action of the department of public instruction in this state from 1858 to the present time, recommending the Bible as a text-book in the district schools, as evidence that the constitutional provision under consideration was not understood by the framers of that instrument, or the people who adopted it, as excluding from such schools the reading of the Bible. The action of that department upon the subject, showing, as it does, the opinions of the eminent scholars and teachers who have presided over it for a long series of years, is entitled to great weight, and on a doubtful question of construction would doubtless be held controlling. But we do not think the true interpretation of the constitutional provision under consideration is doubtful or uncertain, or that any extraneous aid is required in order to interpret it correctly. Hence our judgment cannot properly be controlled by the action of the department of public instruction or the opinions of its learned chiefs. The fact probably is that the practice of Bible reading in the district schools was not seriously challenged at the outset, and not subjected to close legal scrutiny until the policy of the department had become fixed. It was but natural that such policy should, to some extent at least, be thereafter adhered to.

It is further said that the practice of reading the Bible in the district schools prevailed generally after the adoption of the constitution. This is claimed to be a most persuasive fact, showing that it was not the intention of the framers of the constitution, and the people, to prohibit the practice. We do not know how the fact was, but we must be permitted to doubt whether the practice was ever a general one in the district schools of the state. We are quite confident that it is not so 'at the present time. It was said in argument, and not denied, that the practice does not prevail in the public schools in any of the larger cities in the state. But, were the fact otherwise, for the reasons above stated it would not be controlling.

It may not be uninstructive to consider somewhat certain other circumstances, existing when the constitution was adopted, which may fairly be presumed to have influenced the inserting therein of the provision against "sectarian instruction" in the district schools. The early settlers of Wisconsin came chiefly from New England and the Middle States. They represented the best religious, intellectual, and moral culture, and the business enterprise and sagacity, of the people of the states from whence they came. They found here a territory possessing all the elements essential to the development of a great state. They were intensely desirous that the future state should be settled and developed as rapidly as possible. They chose from their number wise, sagacious, Christian men, imbued with the sentiments common to all, to frame their constitution. The convention assembled at a time when immigration had become very large and was constantly increasing. The immigrants came from nearly all the countries of Europe, but most largely from Germany and Ireland. As a class, they were industrious, intelligent, honest, and thrifty — just the material for the development of a new state. Besides, they brought with them, collectively, much wealth. They were

also religious and sectarian.    Among them were Catholics, Jews, and adherents of many Protestant sects.    These immigrants were cordially welcomed, and it is manifest the convention framed the constitution with reference to attracting them to Wisconsin.    Many, perhaps most, of these immigrants came from countries in which a state religion was maintained and enforced, while some of them were non-conformists and had suffered under the disabilities resulting from their rejection of the established religion. What more tempting inducement to cast their lot with us could have been held out to them than the assurance that, in addition to the guaranties of the right of conscience and of worship in their own way, the free district schools in which their children were to be, or might be, educated, were absolute common ground, where the pupils were equal, and where sectarian instruction, and with it sectarian intolerance, under which they had smarted in the old country, could never enter?    Such were the circumstances surrounding the convention which framed the constitution. In the light of them, and with a lively appreciation by its members of the horrors of sectarian intolerance and the priceless value of perfect religious and sectarian freedom and equality, is it unreasonable to say that sectarian instruction was thus excluded, to the end that the child of the Jew, or Catholic, or Unitarian, or Universalist, or Quaker should not be compelled to listen to the stated reading of passages of scripture which are accepted by others as giving the lie to the religious faith and belief of their parents and themselves?

It is argued that the reading of the Bible in the district schools is not included in the constitutional prohibition of sectarian instruction therein, because the Bible is not specifically mentioned in the constitution.    It is said that, if it was intended that such reading was to be excluded, it would have been so provided in direct terms.    The argument

State ex rel. Weiss and others vs. District Board, etc.

may be plausible, but is believed to be unsound. Constitutions deal with general principles and policies, and do not usually descend to a specification of particulars. Such is the character of the provision in question. In general terms it excludes sectarian instruction, and the exclusion includes all forms of such instruction. Its force would or might have been weakened had the attempt been made to specify therein all the methods by which such instruction may be imparted.

We have a statute upon this general subject which must not be overlooked. Sec. 3, ch. 251, Laws of 1883, amending sec. 514, R. S., provides that in cities "no text-books shall be permitted in any free public schools which will have a tendency to inculcate sectarian ideas." Of course, this applies to the public schools of the city of Edgerton. This statute certainly emphasizes the constitutional prohibition, although it may not extend its scope. It is, in effect, a legislative declaration that the use of text-books which have "a tendency to inculcate sectarian ideas" is sectarian instruction, prohibited by the constitution.

For the reasons above stated, we cannot doubt that the use of the Bible as a text-book in the public schools, and the stated reading thereof in such schools, without restriction, "has a tendency to inculcate sectarian ideas," and is sectarian instruction, within the meaning and intention of the constitution and the statute.

7. The answer of the respondent states that the relators' children are not compelled to remain in the school-room while the Bible is being read, but are at liberty to withdraw therefrom during the reading of the same. For this reason it is claimed that the relators have no good cause for complaint, even though such reading be sectarian instruction. We cannot give our sanction to this position. When, as in this case, a small minority of the pupils in the public school is excluded, for any cause, from a stated school

exercise, particularly when such cause is apparent hostility to the Bible which a majority of the pupils have been taught to revere, from that moment the excluded pupil loses caste with his fellows, and is liable to be regarded with aversion and subjected to reproach and insult. But it is a sufficient refutation of the argument that the practice in question tends to destroy the equality of the pupils which the constitution seeks to establish and protect, and puts a portion of them to serious disadvantage in many ways with respect to the others.

8. The foregoing views render unnecessary any extended discussion of the question whether such reading of the Bible is or may be a violation of the rights of conscience guarantied by sec. 18 of the bill of rights (art. I, Const.). There has been considerable discussion concerning the limitations of that right. That there are limitations thereto must be conceded. For example, a Mormon may believe that the practice of polygamy is a religious duty; yet no court would regard his conscience in that behalf for a moment, should he put his belief into practice.

The petition alleges that, in addition to their objections to the King James version, the relators have conscientious scruples against the reading of any version of the Bible to their children, either in the district schools or elsewhere, without authoritative note, comment, or exposition, because the practice may lead their children to adopt dangerous errors, and irreligious faith, practice, and worship. When we remember that wise and good men have struggled and agonized through the centuries to find the correct interpretation of the Scriptures, employing to that end all the resources of great intellectual power, profound scholarship, and exalted spiritual attainment, and yet with such widely divergent results; and, further, that the relators conscientiously believe that their church furnishes them means, and the only means, of correct and infallible inter-

pretation,— we can scarcely say their conscientious scruples against the reading of any version of the Bible to their children, unaccompanied by such interpretation, are entitled to no consideration.

But, however this may be, it may safely be said, and nothing further need be said upon the subject, that when a man's conscience coincides with the law, and he obeys its dictates, he will be protected.

9. Whether the reading of the Bible in the public schools is religious worship, and whether it constitutes the school-house, for the time being, a place of worship, and, if so, whether such reading during school hours as a school exercise, against the consent of a tax-payer, compels him to support a place of worship, within the meaning of sec. 18 of the bill of rights, are questions which will not be here discussed. These questions are considered in an opinion by Mr. Justice Cassoday filed herewith.

10. A number of cases in different states, supposed to have a bearing upon the main question here considered and determined, have been cited, and quotations made therefrom at considerable length by the respective counsel, and by the circuit judge in his elaborate opinion overruling the demurrer to the answer. None of the states in which those decisions were made seem to have in their constitutions a direct prohibition of sectarian instruction in the public schools. It is believed that this state was the first which expressly embodied the prohibition in its fundamental law, and we are not aware of any direct adjudication of the question under consideration by any court previously to Judge Bennett's decision in this case, except (as we are informed) the late Judge Stewart decided, in some case before him in the circuit court of Sauk county (but at what time we are not advised), that the constitution prohibits the reading of the Bible in the district schools. Practically, therefore, we are now determining a question of first im-

pression, and it must necessarily be determined upon general principles of law. Cases from which only mere inferences, more or less remote, can be deduced, afford but little aid to correct judgment in this case. Hence the cases cited have not been specially referred to in this opinion. Some of them are nearer in point on the question considered by Mr. Justice CASSODAY, and he has referred to and commented upon them in his opinion.

11. The drift of some remarks in the argument of counsel for the respondent, and perhaps also in the opinion of Judge BENNETT, is that the exclusion of Bible reading from the district schools is derogatory to the value of the Holy Scriptures, a blow to their influence upon the conduct and consciences of men, and disastrous to the cause of religion. We most emphatically reject these views. The priceless truths of the Bible are best taught to our youth in the church, the Sabbath and parochial schools, the social religious meetings, and, above all, by parents in the home circle. There, those truths may be explained and enforced, the spiritual welfare of the child guarded and protected, and his spiritual nature directed and cultivated, in accordance with the dictates of the parental conscience. The constitution does not interfere with such teaching and culture. It only banishes theological polemics from the district schools. It does this, not because of any hostility to religion, but because the people who adopted it believed that the public good would thereby be promoted, and they so declared in the preamble. Religion teaches obedience to law, and flourishes best where good government prevails. The constitutional prohibition was adopted in the interests of good government; and it argues but little faith in the vitality and power of religion to predict disaster to its progress because a constitutional provision, enacted for such a purpose, is faithfully executed.

*By the Court.*— The order of the circuit court overruling

the demurrer of the relators to the answer of the school board must be reversed, and the cause remanded with directions to that court to give judgment for the relators on the demurrer, awarding a peremptory writ of *mandamus* as prayed in the petition.

CASSODAY, J.  The gravity of the questions involved in this case is fully appreciated. They have received the careful consideration of all the members of the court.  The writing of the formal opinion has fallen to the lot of Mr. Justice LYON. At his suggestion, a separate presentation of one branch of the case is here made.  Before entering upon its direct discussion, however, but as leading to it, a few general observations may not be wholly unprofitable.

It is undoubtedly true, as once observed by Mr. Justice BALDWIN, that " in the construction of the constitution we must look to the history of the times, and examine the state of things existing when it was framed and adopted, *to ascertain the old law, the mischief, and the remedy.*" *Rhode Island v. Massachusetts,* 12 Pet. 723.  A few years later, Mr. Justice STORY said: " Perhaps the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties, and rights, with all the lights and aids of contemporary history; and to give to the words of each, just such operation and force, consistent with their legitimate meaning, as may *fairly secure and attain the ends proposed.*" *Prigg v. Pennsylvania,* 16 Pet. 610, 611.  These observations were, of course, made with reference to our federal constitution, but they are equally applicable to our state constitution. In so far as the rules there suggested may aid in the construction of the provisions of our constitution here involved, they may properly be invoked.  It is probably in this view that counsel have dwelt so extensively upon the history of the Christian church and its *status* under different charters

and constitutions; although much of it has a very remote, if any, bearing upon the questions here presented.

All are familiar with the fact that the Jews, in the time of the apostles, were divided into "the *sect* of the Sadducees," and "the *sect* of the Pharisees." Paul declared, in the presence of Agrippa, "that, after the *straitest sect*" of their religion, he had "lived a Pharisee;" and, when Tertullus charged him with being "a ringleader of *the sect of the Nazarenes*," he boldly confessed "that after the way which they" called "heresy," or, as the new version has it, "a sect," he had worshiped or served the God of his fathers; and afterwards, to the "chief of the Jews" at Rome, he discoursed "concerning this sect," and persuaded "them concerning Jesus, both from the law of Moses and from the prophets." Of course, "the sect of the Nazarenes" subsequently acquired the more honorable name of "Christians." As the centuries rolled on and Christians became more numerous, disputes arose among themselves, from time to time, in matters of faith, doctrine, practice, and interpretation of certain passages of Scripture; and these led to repeated divisions and subdivisions, until the different sects of Christians became very numerous. There is no purpose here of indicating that the Holy Scriptures,— the Old and New Testament,— if considered as a whole and fully comprehended, would exclude from the promises therein contained any of the human race complying with the essential conditions therein prescribed; but since every translation made by man must be more or less imperfect, and since the application of particular passages is liable to be made with partial apprehension and biased or even distorted judgment, it is easy to perceive how texts of Scripture may be read with such an emphasis and tone as to become excessively sectarian. While the members of any particular sect may be willing to have one of their own number read the Bible in the public schools, yet they are

not always willing to concede the same to a member of a sect believing in an opposite faith or doctrine. But the law is impartial, and has given no rights to any one sect that are not equally secured to every other.

The relation of the church to the Scriptures has been a subject of controversy ever since the Reformation. Upon that question even Protestants have differed. Some have gone so far as to say that "the Bible, and the Bible only, is the religion of Protestants;" while others have declared that "the living church is more than the dead Bible, for it is the Bible and something more." The relations of church and state have been the subject of discussion for many centuries; and at certain times, and in certain nations of Europe, one particular sect has been the established church of the state, and at other times or in other nations the belief of some other sect has been the established religion — while other sects, not so favored, were either exterminated altogether or permitted to remain on conditions more or less disagreeable and humiliating. These discriminations naturally generated bitterness, enmities, and even cruel war among brethren. Many of the early immigrants to this country had felt the despotism of such intolerance, and came hither in consequence of it. They came from different countries of Europe, and, consequently, had experienced different types of intolerance. Some of them were as narrow minded in such matters as their oppressors had been; and hence no sooner acquired civil power than they themselves became intolerant towards all sects except their own.

Such divisions, controversies, and contentions among professing Christians were supposed by many to be repugnant to the sublime teachings and fraternal spirit revealed to the world through Jesus Christ. Many of the colonists — especially when they came to the formation of state governments — proved to be sufficiently broad and liberal to exact nothing for themselves or their particular sect that

they were unwilling to grant to every other citizen and his particular sect. This benign spirit seemed to extend, as its wisdom became more manifest by experience. True, the constitution of South Carolina, adopted in 1778, declared that the "Christian Protestant religion" was the "established religion" of that state; but that was modified in 1790 so as to secure freedom and prevent discrimination or preference in worship or religion. The constitution of North Carolina of 1776 excluded from office all non-believers in the Protestant religion or the divine authority of the Old or New Testament; while the constitution of Delaware, of the same year, made every official subscribe to a confession of faith; but that was abrogated sixteen years afterwards, and equal protection was extended to all sects. So the first constitutions of Maryland, Massachusetts, and New Hampshire, and, later, of Connecticut, provided for the support, by taxation or otherwise, of the Christian or Protestant Christian religion, with more or less toleration guarantied to other sects. Such direct sanction and toleration seem to have been inspired by a lingering attachment for, or a sympathy with, the European theory of union between church and state. But the several states of New Jersey, New York, Pennsylvania, Vermont, and Virginia from the first, and, later, Maine and Rhode Island, of the New England states, and every, or nearly every, state admitted into the Union after the organization of the federal government, expressly secured, in effect, in their respective state constitutions, the equal freedom of every religious sect, organization, and society, with a guaranty against preference or discrimination. So firm had become the public conviction in favor of a broad liberality and equal protection in such matters, at the time of the organization of our national government, that although the federal constitution as originally adopted did not mention or refer to the subject, yet the first session of the first Congress proposed the first

amendment to that instrument, prohibiting Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof," notwithstanding no power had therein been granted to enact such a law, and no such law could be legally enacted without such grant of power first being made.

The learned counsel for the school board contends, in effect, that the third of the "articles of compact between the original states and the people and states" carved out of the old "Northwest Territory" is still in force in Wisconsin; and that under it this state is required and bound to directly foster and encourage "religion" through schools and education. Assuming such to be the meaning of the article,— which is, to say the least, debatable,— still it is only necessary here to say, in addition to what is said by my associate, that by the adoption of our state constitution and the admission of the state into the Union that article became superseded and ceased to be longer in force. This has, in effect, been firmly settled by the repeated decisions of the supreme court of the United States. *Pollard v. Hagan*, 3 How. 212; *Permoli v. First Municipality*, 3 How. 609; *Strader v. Graham*, 10 How. 94, 97; *Escanaba Co. v. Chicago*, 107 U. S. 678; *Cardwell v. American Bridge Co.* 113 U. S. 205; *Huse v. Glover*, 119 U. S. 543; *Sands v. Manistee R. Imp. Co.* 123 U. S. 288; *Willamette Bridge Co. v. Hatch*, 125 U. S. 9.

The question, therefore, recurs, whether the provisions of our state constitution here involved, when construed with reference to the evils or supposed evils thereby sought to be suppressed and the object or purpose thereby sought to be secured, permitted or prohibited the stated reading of the Bible as a text-book in the public schools.

Wisconsin, as one of the later states admitted into the Union, having before it the experience of others, and probably in view of its heterogeneous population, as mentioned

in the opinion of my associate, has, in her organic law, probably furnished a more complete bar to any preference for, or discrimination against, any religious sect, organization, or society than any other state in the Union. Our state constitution expressly prohibits any religious test as a qualification for office, or the exclusion of any witness in consequence of his religious opinion. Sec. 19, art. I. Aside from the clause just referred to, and the one against sectarian instruction so fully considered by my Brother LYON, our state constitution provides that (1) "the right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed;" (2) "nor shall any man be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent;" (3) "nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship;" (4) "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." Sec. 18, art. I. The decisions of courts in states having no such constitutional prohibition, of course, can have no application to the case at bar.

The question thus presented is not one of sectarian predilection, nor of religious belief, nor of theological conception, nor of sentiment, but one of fundamental law. It is no part of the duty of this court to make or unmake, but simply to construe this provision of the constitution. All questions of political and governmental ethics, all questions of policy, must be regarded as having been fully considered by the convention which framed, and conclusively determined by the people who adopted, the constitution more than forty years ago. The oath of every official in the state is to support that constitution as it is, and not as it might have been. *Wisconsin Cent. R. Co. v. Taylor Co.* 52

Wis. 58; *Lake Co. v. Rollins*, 130 U. S. 672. That oath is to be kept sacred, with strict integrity of purpose, and without any sectarian, religious, or political bias or equivocation.

In considering the meaning of the section of the constitution quoted, we are to remember that canon of construction adverted to by my associate, and aptly expressed by MARSHALL, C. J., in these words: "Although the spirit of an instrument, especially of a constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words. It would be dangerous in the extreme to infer from extrinsic circumstances that a case for which the words of an instrument expressly provide shall be exempt from its operation." *Sturges v. Crowninshield*, 4 Wheat. 202. Similar expressions have come to us from the same court within a year. "If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning apparent on the face of the instrument must be accepted, and neither the courts nor the legislature have the right to add to it or take from it." *Lake Co. v. Rollins*, 130 U. S. 670.

The first and third clauses of the section of the constitution quoted are similar in their scope, and may therefore be considered together. They read: (1) "The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed;" (3) "nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship." This language is quite similar to, and may have been taken in part from, the constitution of Pennsylvania, as well as other states. In commenting upon a similar clause in the Pennsylvania constitution, in the celebrated Girard Will Case, Mr. Justice STORY, speaking for the whole court, ob-

served: "Language more comprehensive for the complete protection of every variety of religious opinion could scarcely be used; and it must have been intended *to extend equally to all sects*, whether they believed in Christianity or not, and whether they were Jews or infidels. So that we are compelled to admit that, although Christianity be a part of the common law of the state, yet it is so in this qualified sense that its divine origin and truth are admitted, and ·therefore it is not to be maliciously and openly reviled and blasphemed against, to the annoyance of believers or the injury of the public. Such was the doctrine of the supreme court of Pennsylvania in *Updegraph v. Comm.* 11 Serg. & R. 394." *Vidal v. Girard's Ex'rs*, 2 How. 198. In commenting upon a similar clause in the Ohio constitution, Mr. Justice THURMAN, speaking for the whole court, said: "We sometimes hear it said that all religions are *tolerated* in Ohio; but the expression is not strictly accurate. Much less accurate is it to say that one religion is a part of our law, *and all others only tolerated.* It is not by *mere toleration* that every individual here is protected in his belief or disbelief. He reposes not upon the *leniency* of government or the *liberality* of any class or sect of men, but upon his natural, indefeasible *rights* of conscience, which, in the language of the constitution, are beyond the control or interference of any human authority." *Bloom v. Richards*, 2 Ohio St. 390.

In considering the two clauses quoted from our constitution, we are to bear in mind the general proposition conceded by all, that our state constitution is not a grant, but a limitation, of powers. *State ex rel. Graef v. Forest Co.* 74 Wis. 615. Viewed in this light, and it will readily be perceived that these clauses operate as a perpetual bar to the state, and each of the three departments of the state government, and every agency thereof, from the infringement, control, or interference with the individual rights of

every person, as indicated therein, or the giving of any preference by law to any religious sect or mode of worship. They presuppose the voluntary exercise of such rights by any person or body of persons who may desire, and by implication guaranty protection in the freedom of such exercise. We neither have nor can have in this state, under our present constitution, any statutes of toleration, nor of union, directly or indirectly, between church and state — for the simple reason that the constitution forbids all such preferences and guaranties all such rights. But the exercise of such rights by one person, or any given number of persons, cannot be so extended as to interfere with the exercise of similar rights by other persons, nor so far as to prevent the legitimate exercise of the police powers of the state in preserving order, securing good citizenship, the administration of law, and the Sabbath as a day of rest. *Stansbury v. Marks*, 2 Dall. 213; *Comm. v. Wolf*, 3 Serg. & R. 48; *Comm. v. Lesher*, 17 Serg. & R. 155; *McGatrick v. Wason*, 4 Ohio St. 566; *Simon's Ex'rs v. Gratz*, 23 Am. Dec. 33; *Shover v. State*, 10 Ark. 259; *Ferriter v. Tyler*, 48 Vt. 469; *State ex rel. Walker v. Judge*, 39 La. Ann. 132. Such statutes come within no constitutional prohibition, and are founded upon an impregnable basis.

The two clauses mentioned recognize the existence of different religious establishments or sects, and different modes of worship; but they do not have so direct a bearing upon the question here presented as the second and fourth clauses, which will now be considered.

The second clause of the section quoted is to the effect that no man shall "be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent." Is the stated reading of the Bible in the public schools, as a text-book, "worship," within the meaning of this clause?

As indicated in the clauses already considered, the word

"worship," as here used, includes any and every mode of worshiping Almighty God. Webster has defined it as: "The act of paying divine honors to the Supreme Being; religious reverence and homage; adoration paid to God, or a being viewed as God. . . . 'The worship of God is an eminent part of religion, and prayer is a chief part of religious worship.'" Worcester defines it as: "(3) Adoration; a religious act of reverence; honor paid to the Supreme Being, or by heathen nations to their deities. 'Worship consists in the performance of all those external acts, and the observance of all those rites and ceremonies, in which men engage with the professed and sole view of honoring God.' . . . 'They join their vocal worship to the quire of creatures wanting voice.' . . . (4) Honor; respect; civil deference." The Imperial defines it as: "(4) Chiefly and eminently, the act of paying divine honors to the Supreme Being; or the reverence and homage paid to him in religious exercises, consisting in adoration, confession, prayer, thanksgiving, and the like." The Bible Dictionary declares that the "worship of God, both spiritual and visible, private and public, by individuals, families, and communities, . . . is abundantly commanded in his word." In theology, we are told that "the honor which is due in a peculiar sense to God consists, supremely, in religious worship, in making Him the object of our supreme affection, and *rendering to Him our supreme obedience.*" 1 Dwight's Theo. 555.

Certainly, the reading of the Holy Scriptures as the eternal word of God, in obedience to the often-repeated injunction therein contained, whether by the individual in private, or in the family, or in the public assembly, is an essential part of divine worship. Every sermon is based upon some text of scripture. Most prayers are preceded by the reading of some passage of Scripture, as an intelligent guide to the thoughts of the worshiper or worshipers. The sermon

on the mount contains the prayer taught by the blessed Lord. Is it possible for any genuine believer in the Christian religion to read, or listen to the reading of, that sermon, and especially that prayer, without being filled with a holy sense of honor, reverence, adoration, and homage to Almighty God, which is the very essence of worship?

We must hold that the stated reading of the Bible in the public schools as a text-book may be " worship " within the meaning of the clause of the constitution under consideration. If, then, such reading of the Bible is worship, can there be any doubt but what the school-room in which it is so statedly read is a " place of worship," within the meaning of the same clause of the constitution?

Counsel seem to argue that such place of worship should be confined to some church edifice, or place where the members of a church statedly worship. Some of the earlier constitutions, having similar clauses, used the words " building " and " church." Manifestly, the words " place of worship " were advisedly used, as applicable to any " place " or structure where worship is statedly held, and which the citizen is " compelled to attend," or the tax-payers are compelled to " erect or support." The mere fact that only a small fraction of the school hours is devoted to such worship, in no way justifies such use as against an objecting tax-payer. If the right be conceded, then the length of time so devoted becomes a matter of discretion. If such right does not exist, then any length of time, however short, is forbidden. The relators, as tax-payers of the district, were compelled to aid in the erection of the school building in question, and also to aid in the support of the school maintained therein. Secs. 430, 430a, S. & B. Ann. Stats. Being thus compelled to aid in such erection and support, they have a legal right to object to its being used as a " place of worship." In fact, it has been held that it can be devoted to no other use, as against an objecting

tax-payer. *School Dist. v. Arnold*, 21 Wis. 657. In that case a temperance society obtained permission from a majority of the electors present at a school meeting, duly called, to hold its meetings in the school-house; but it was held that such electors had no authority to thus divert its use. The present chief justice, speaking for the court, among other things said: "The statute has not given the board, nor the electors of the district, any authority to permit a school-house to be used for meetings of the Sons of Temperance, or anything of the kind. So the action of the electors of the district . . . was wholly unauthorized, and furnished no defense to the action." To the same effect are *Spencer v. Joint School Dist.* 15 Kan. 259, 22 Am. Rep. 268; *Dorton v. Hearn*, 67 Mo. 301; *Scofield v. Eighth School Dist.* 27 Conn. 499; *Weir v. Day*, 35 Ohio St. 143. There are cases of a contrary import, but it is very certain that, as against an objecting tax-payer, such school-house cannot be devoted to a use expressly forbidden by the constitution of the state — as, for instance, as a place of worship.

There is another feature of the clause we are considering which requires attention. Under our statutes the children of the relators, between certain ages, were bound to attend some public or private school for a certain period of each year. Sec. 489*a*, S. & B. Ann. Stats. (ch. 121, Laws of 1879; ch. 298, Laws of 1882; ch. 73, Laws of 1887), superseded by sec. 489*b*, S. & B. Ann. Stats. (ch. 519, Laws of 1889). In the case of a poor man incapable of educating his children at private expense, they are " compelled to attend " such school without the consent of themselves or their parents, notwithstanding it is, in a limited sense, a place of worship; and in the case of men of property it might impose an unauthorized burden. This, as we understand, is prohibited by the clause of the constitution we are considering.

The fourth clause of the section of the constitution quoted declares, in effect, that no money shall " be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." As argued by the learned counsel for the school board, the word " treasury " in this clause probably refers to the state treasury. But we are to remember that the school in question receives annually from the state treasury its proportionate share, not only of the school fund income (sec. 554, R. S.; sec. 3, ch. 124, Laws of 1885; and ch. 277, Laws of 1887), but also of the one mill tax (sec. 1070a, S. & B. Ann. Stats.; ch. 287, Laws of 1885). The question thus recurs whether the money thus drawn from the state treasury for the maintenance and support of the school in question is for the benefit of a religious seminary, within the meaning of this clause of the constitution. A seminary is defined by Webster as a " place of training; institution of education; a school, academy, college, or university, in which young persons are instructed in the several branches of learning which may qualify them for their future employments." It manifestly includes institutions of learning or education of different grades. But a religious seminary of any one grade is just as effectually forbidden as a religious seminary of any higher or other grade. The thing that is prohibited is the drawing of any money from the state treasury for the benefit of any religious school. If the stated reading of the Bible in the school as a text-book is not only, in a limited sense, worship, but also instruction, as it manifestly is, then there is no escape from the conclusion that it is religious instruction; and hence the money so drawn from the state treasury was for the benefit of a religious school, within the meaning of this clause of the constitution.

The constitutions of Massachusetts, New Hampshire, and some other states differ so widely from ours as to make the adjudications in those states almost wholly inapplicable to

the question here presented. It is conceded that no decision has been found, under constitutional provisions like ours, squarely sustaining the ruling of the learned trial court. Some things have been said in some of the cases cited, arising under somewhat similar constitutional provisions, that may seem to support it. Among these are *Donahoe v. Richards*, 38 Me. 379, 61 Am. Dec. 256; *Ferriter v. Tyler*, 48 Vt. 444; *Moore v. Monroe*, 64 Iowa, 367; *Millard v. Board*, 121 Ill. 297. The Maine case, largely involving other considerations, is based in part upon decisions under constitutions widely differing from ours, and was decided under a constitution containing none of the provisions upon which especial stress is here laid. The same is partially true of the Vermont case. The same is true in a limited sense of the Iowa and Illinois cases, and in neither of which is any adjudication cited. The following cases seem to be in harmony with the conclusions we have reached: *State ex rel. Nevada Orphan Asylum v. Hallock*, 16 Nev. 373; *Board v. Minor*, 23 Ohio St. 211; *State ex rel. Stallard v. White*, 82 Ind. 278, 42 Am. Rep. 496; *Spencer v. Joint School Dist.* 15 Kan. 259, 22 Am. Rep. 268; *Dorton v. Hearn*, 67 Mo. 301; *Scofield v. Eighth School Dist.* 27 Conn. 499; and *Weir v. Day*, 35 Ohio St. 143. They are, moreover, in harmony with prior decisions of this court. *Morrow v. Wood*, 35 Wis. 59; *School Dist. v. Arnold*, 21 Wis. 657. In the Nevada case the decision was adverse to the use of the Catholic Bible. We deem it unnecessary to enter upon an extended analysis of the numerous adjudications cited, since the constitutional provisions here involved rest upon us with an imperative command.

The unanimous result of our deliberations is as directed by Mr. Justice LYON.

ORTON, J. I most fully and cordially concur in the decision and in the opinions of Justices LYON and CASSODAY

in this case.    It is not needful that any other opinion should be written, but I thought it proper to state briefly some of the reasons which have induced such concurrence in the decision.

"The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect, or support any place of worship;  .  .  .  nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship." Const. art. I, sec. 18.

"No religious test shall ever be required as a qualification for any office of public trust under the state, and no person shall be rendered incompetent to give evidence in any court of law or equity, in consequence of his opinions on the subject of religion." Const. art. I, sec. 19.

The interest of the school fund, "and all other revenues derived from the school lands, shall be exclusively applied," etc., "to the support and maintenance of *common schools*, in each school district," etc.    Const. art. X, sec. 2, subd. 1.

"The legislature shall provide by law for the establishment of district schools, which shall be as nearly *uniform* as practicable; and such schools shall be *free*, and without charge for tuition, to *all* children between the ages of four and twenty years; and no *sectarian* instruction shall be allowed therein." Const. art. X. sec. 3.

"Each town and city shall be required to raise *by tax* annually for the support of *common schools* therein a sum not less," etc.    Const. art. X, sec. 4.

"Provision shall be made by law for the distribution of the income of the school fund among the several towns and cities of the state for the support of *common schools* therein," etc.    Const. art. X, sec. 5.

These provisions of the constitution are cited together to

show how completely this state, as a civil government, and all its civil institutions, are divorced from all possible connection or alliance with any and all religions, religious worship, religious establishments, or modes of worship, and with everything of a religious character or appertaining to religion; and to show how completely all are protected in their religion and rights of conscience, and that no one shall ever be taxed or compelled to support any religion or place of worship, or to attend upon the same, and more especially to show that our *common schools*, as one of the institutions of the state created by the constitution, stand, in all these respects, like any other institution of the state, completely excluded from all possible connection or alliance with religion or religious worship, or with anything of a religious character, and guarded by the constitutional prohibition that "no sectarian instruction shall be *allowed* therein." They show, also, that the common schools are free to all alike, to all nationalities, to all sects of religion, to all ranks of society, and to all complexions. For these equal privileges and rights of instruction in them, all are taxed equally and proportionately. The constitutional name, "common schools," expresses their equality and universal patronage and support. *Common* schools are not common as being low in character or grade, but *common* to all alike, to everybody, and to all sects or denominations of religion, but without bringing religion into them. The common schools, like all the other institutions of the state, are protected by the constitution from all "control or interference with the rights of conscience," and from all preferences given by law to any religious establishments or modes of worship. As the state can have nothing to do with religion except to protect every one in the enjoyment of his own, so the common schools can have nothing to do with religion in any respect whatever. They are as completely *secular* as any of the other institutions of the state,

in which all the people alike have equal rights and privileges. The people cannot be taxed for religion in schools more than anywhere else. Religious instruction in the common schools is as clearly prohibited by these general clauses of the constitution as religious instruction or worship in any other department of state supported by the revenues derived from taxation.

The clause that "no sectarian instruction shall be allowed therein" was inserted *ex industria* to exclude everything pertaining to religion. They are called by those who wish to have not only religion, but their own religion, taught therein, "Godless schools." They are Godless, and the educational department of the government is Godless, in the same sense that the executive, legislative, and administrative departments are Godless. So long as our constitution remains as it is, no one's religion can be taught in our common schools. By religion I mean religion as a system; not religion in the sense of natural law. Religion in the latter sense is the source of all law and government, justice, and truth. Religion, as a system of belief, cannot be taught without offense to those who have their own peculiar views of religion, no more than it can be without offense to the different sects of religion. How can religion, in this sense, be taught in the common schools without taxing the people for or on account of it? The only object, purpose, or use for taxation by law in this state must be exclusively *secular.* There is no such source and cause of strife, quarrel, fights, malignant opposition, persecution, and war, and all evil in the state, as religion. Let it once enter into our civil affairs, our government would soon be destroyed. Let it once enter our common schools, they would be destroyed. Those who made our constitution saw this, and used the most apt and comprehensive language in it to prevent such a catastrophe.

It is said, if reading the Protestant version of the Bible

in school is offensive to the parents of some of the scholars, and antagonistic to their own religious views, *their children can retire.* They ought not to be compelled to go out of the school for such a reason for one moment. The suggestion itself concedes the whole argument. That version of the Bible is hostile to the belief of many who are taxed to support the common schools, and who have equal rights and privileges in them. It is a source of religious and sectarian strife. That is enough. It violates the letter and spirit of the constitution.

No state constitution ever existed that so completely excludes and precludes the possibility of religious strife in the civil affairs of the state, and yet so fully protects all alike in the enjoyment of their own religion. All sects and denominations may teach the people their own doctrines in all proper places. Our constitution protects all, and favors none. But they must keep out of the common schools and civil affairs. It requires but little argument to prove that the Protestant version of the Bible, or any other version of the Bible, is the source of religious strife and opposition, and opposed to the religious belief of many of our people. It is a *sectarian* book. The Protestants were a very small sect in religion at one time, and they are a sect yet, to the great Catholic Church, against whose usages they protested, and so is their version of the Bible sectarian, as against the Catholic version of it.

The common school is one of the most indispensable, useful, and valuable civil institutions this state has. It is democratic, and free to all alike, in perfect equality, where all the children of our people stand on a common platform and may enjoy the benefits of an equal and common education. An enemy to our common schools is an enemy to our state government. It is the same hostility that would cause any religious denomination that had acquired the ascendency over all others, to remodel our constitution and

change our government and all of its institutions so as to make them favorable only to itself, and exclude all others from their benefits and protection. In such an event, religious and sectarian instruction will be given in all schools. Religion needs no support from the state. It is stronger and much purer without it.

This case is important and timely. It brings before the courts a case of the plausible, insidious, and apparently innocent entrance of religion into our civil affairs, and of an assault upon the most valuable provisions of the constitution. Those provisions should be pondered and heeded by all of our people, of all nationalities, and of all denominations of religion, who desire the perpetuity, and value the blessings, of our free government. That such is their meaning and interpretation no one can doubt, and it requires no citation of authorities to show. It is religion and sectarian instruction that are excluded by them. Morality and good conduct may be inculcated in the common schools, and should be. The connection of church and state corrupts religion, and makes the state despotic.

See note to this case in 29 Am. Law Reg. 286, 321.— REP.