# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2022AP1334 |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the adoption of M. M. C.: |

A. M. B.,
            Petitioner-Appellant,
T. G.,
            Appellant,
      v.
Circuit Court for Ashland County, the Honorable
Kelly J. McKnight, presiding,
            Respondent.

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | April 30, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 11, 2023 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Ashland |
| JUDGE: | Kelly J. McKnight |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and HAGEDORN, J., joined. DALLET, J., filed a concurring opinion in which ANN WALSH BRADLEY, and PROTASIEWICZ, JJ., joined. KAROFSKY, J., filed a concurring opinion.
NOT PARTICIPATING:

ATTORNEYS:

    For the petitioner-appellant, there were briefs filed by *John R. Carlson, Carla J. Smith, Linda I. Coleman*, and *Spears, Carlson & Coleman, S.C., Washburn*. There was an oral argument by *Carla Jean Smith* and *John R. Carlson*.

For the respondent, there was a brief filed by *Lynn K. Lodahl*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general. There an oral argument by *Lynn K. Lodahl*, assistant attorney general.

An amicus curiae brief was filed by *Daniel R. Suhr*, and *Hughes & Suhr LLC, Chicago, IL*, on behalf of Wisconsin Family Council.

**2024 WI 18**

No. 2022AP1334
(L.C. No. 22AD2)

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

STATE OF WISCONSIN                    :        IN SUPREME COURT

In the matter of the adoption of M. M. C.:

**A. M. B.,**
        **Petitioner-Appellant,**

**T. G.,**
        **Appellant,**

        **v.**

**Circuit Court for Ashland County, the Honorable Kelly J. McKnight, presiding,**

        **Respondent.**

**FILED**

**APR 30, 2024**

Samuel A. Christensen
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and HAGEDORN, J., joined. DALLET, J., filed a concurring opinion in which ANN WALSH BRADLEY, and PROTASIEWICZ, JJ., joined. KAROFSKY, J., filed a concurring opinion.

        APPEAL from a judgment and an order of the Circuit Court for Ashland County, Kelly J. McKnight, Judge. *Affirmed*.

        ¶1  REBECCA GRASSL BRADLEY, J. A creature of statute, adoption confers legal rights and duties on adopted children and

their adoptive parents. The legislature has made policy choices regarding the circumstances under which children may be adopted and by whom. A.M.B. is the biological mother of M.M.C. and wishes to have her nonmarital partner, T.G., adopt M.M.C. Under the adoption statutes, T.G. is not eligible to adopt M.M.C. because T.G. is not A.M.B.'s spouse. A.M.B. and T.G. allege the legislatively drawn classifications violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in denying T.G. the right to adopt M.M.C. and in denying M.M.C. the right to be adopted by T.G. Because the adoption statutes do not restrict a fundamental right or regulate a protected class, we consider whether any rational basis exists for the legislative limits on eligibility to adopt a child. Among other legitimate state interests, promoting stability for adoptive children through marital families suffices for the statutes to survive this equal protection challenge; therefore, we affirm the circuit court.[1]

## I. BACKGROUND

### A. The Adoption Statutes

¶2 Wisconsin Stat. ch. 48, subchapter XIX, establishes legal adoption and specifies the circumstances under which a child may be adopted as well as who is eligible to adopt. Under Wis. Stat. § 48.81 (2021-22),[2] a child who is present in the

---

[1] The Honorable Kelly J. McKnight, Ashland County, presiding.

[2] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

State of Wisconsin when the adoption petition is filed may be adopted under any of the following four scenarios: (1) the parental rights of both parents have been legally terminated; (2) both parents are deceased; (3) the parental rights of one parent have been terminated and the other parent is deceased; or (4) "[t]he person filing the petition for adoption is the spouse of the child's parent with whom the child and the child's parent reside."[3] § 48.81(1)-(4); Rosecky v. Schissel, 2013 WI 66, ¶44, 349 Wis. 2d 84, 833 N.W.2d 634. Subsection (4) applies only if the child's other parent is deceased or his parental rights have been terminated. § 48.81(4)(a)-(b). Colloquially called the "stepparent" exception, this provision permits a stepparent to adopt his spouse's child while the spouse's parental rights remain intact. See Wis. Stat. § 48.92(2).

¶3 The adoption statutes additionally identify three classifications of individuals who may adopt an eligible child: "A husband and wife jointly," "either the husband or wife if the other spouse is a parent of the minor," or "an unmarried adult." Wis. Stat. § 48.82(1)(a)-(b). The statutes do not allow two unmarried adults to jointly adopt a minor. Nor do the statutes permit a nonmarital partner to adopt his partner's child. Omitting those categories of unmarried individuals from the list of eligible persons who may adopt means the law does not qualify them as adoptive parents. "Under the doctrine of expressio

---

[3] Two additional statutory criteria apply only to children who are born in, or citizens of, foreign jurisdictions, and are not relevant in this case. Wis. Stat. § 48.81(5)-(6).

unius est exclusio alterius, the 'express mention of one matter excludes other similar matters [that are] not mentioned.'" James v. Heinrich, 2021 WI 58, ¶18, 397 Wis. 2d 517, 960 N.W.2d 350 (alteration in original) (quoting FAS, LLC v. Town of Bass Lake, 2007 WI 73, ¶27, 301 Wis. 2d 321, 733 N.W.2d 287); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012) ("[T]he principle that specification of the one implies exclusion of the other validly describes how people express themselves and understand verbal expression.").

¶4    The adoption subchapter also describes the legal effect of adoption on the child, the child's birth parents, and the child's adoptive parents.  Wis. Stat. § 48.92.  Upon entry of an order of adoption, all legal rights, duties, and "other legal consequences" of the relationships between the birth parents and the child are forever altered and "cease to exist." § 48.92(2).  If, however, the adoptive parent is married to the child's birth parent, the adoption by the stepparent extinguishes the legal rights, duties, and "other legal consequences" only with respect to the birth parent who is not the spouse of the adoptive parent.  § 48.92(2).

B.  Facts and Procedural History

¶5  A.M.B.  is the biological mother of M.M.C.  and maintains a cohabitating, nonmarital relationship with her male partner, T.G.  After more than a decade in a relationship with A.M.B., T.G. has become a father figure for M.M.C. and has assumed a variety of parental duties for her.  The parental

rights of M.M.C.'s biological father have been terminated. Based on T.G.'s fatherly bond and relationship with M.M.C., T.G. filed a joint petition with A.M.B. to adopt M.M.C.

¶6 Prior to the adoption hearing, the county department of human services generated a "Home Study Report," which included a background check of T.G., a review of T.G.'s relationship with M.M.C., and an interview with M.M.C. The interview with M.M.C. revealed she did not have a meaningful relationship with her biological father and views T.G. as her father. The report concluded with a recommendation to grant the adoption.

¶7 On June 20, 2022, the circuit court held a hearing on the adoption petition. At the outset, the court raised concerns over its authority to grant the petition given the criteria for adoption under Wis. Stat. § 48.81, despite having determined the adoption would be in the best interests of the child, M.M.C. The circuit court cited this court's decision in Georgina G. v. Terry M., 184 Wis. 2d 492, 516 N.W.2d 678 (1994), which the circuit court summarized as precluding "an adoption to a third party who is not the spouse of the parent." Because T.G. was not married to A.M.B., the circuit court determined T.G. was not statutorily eligible to adopt M.M.C. and denied the adoption petition.

¶8 A.M.B. and T.G. appealed the circuit court's decision, arguing that Wis. Stat. §§ 48.81 and 48.92(2) violate the equal protection rights of M.M.C. and T.G. The state asked the court of appeals to affirm the denial of the adoption petition under

5

Georgina G., 184 Wis. 2d 492, in which this court decided an earlier but substantially similar version of the governing statute[4] did not violate the equal protection clause. Because the court of appeals cannot "overrule, modify or withdraw language from a previous supreme court case[,]" Cook v. Cook, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997), A.M.B. and T.G. petitioned this court for bypass of the court of appeals, which this court granted.[5]

¶9 The adoption statutes do not implicate a fundamental right under the United States or Wisconsin Constitutions, nor do the statutes affect a protected class of individuals. Accordingly, the statutory classifications establishing eligibility to adopt or to be adopted must be rationally related to a legitimate state interest in order to withstand A.M.B.'s challenge. Because a rational basis exists for the legislature's policy choice to preclude an adoption by the nonmarital partner of a birth parent, we hold the statutes do

---

[4] After this court's decision in Georgina G. v. Terry M., 184 Wis. 2d 492, 516 N.W.2d 678 (1994), the legislature amended Wis. Stat. § 48.81 to explicitly state that the parental rights of only one biological parent must be terminated for a stepparent to adopt. 1997 Wis. Act 104, § 9. The applicable statutes in this case are otherwise identical to the statutes analyzed in Georgina G.

[5] In their briefing, petitioners argued the circuit court erred in applying the statutory limits on adoption despite the legislative directive in Wis. Stat. § 48.01(1) that "the best interests of the child or unborn child shall always be of paramount consideration." During oral argument, petitioners abandoned their statutory claim.

6

not violate the Equal Protection Clause and we therefore affirm the circuit court's denial of the adoption petition.

## II. STANDARD OF REVIEW

¶10 A.M.B. and T.G. bring a facial challenge to the constitutionality of the adoption statutes on equal protection grounds. The constitutionality of a statute is a question of law this court reviews de novo. Blake v. Jossart, 2016 WI 57, ¶26, 370 Wis. 2d 1, 884 N.W.2d 484 (citing Aicher ex rel. LaBarge v. Wis. Patients Comp. Fund, 2000 WI 98, ¶18, 237 Wis. 2d 99, 613 N.W.2d 849). A party bringing a facial challenge to the constitutionality of a statute must show that the "State cannot enforce the law under any circumstances." Id. (citing State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63).

## III. ANALYSIS

¶11 The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution states, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.[6] A.M.B.

___

[6] Although petitioners bring their claims under the Equal Protection Clause and Article I, Section 1 of the Wisconsin Constitution, they do not provide an independent argument under the Wisconsin Constitution. Instead, petitioners treat the two constitutional provisions as providing the same protections. "As a general principle, this court treats these provisions of the United States and Wisconsin Constitutions as consistent with each other in their due process and equal protection guarantees." Blake v. Jossart, 2016 WI 57, ¶28, 370 Wis. 2d 1, 884 N.W.2d 484; accord Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶35, 383 Wis. 2d 1, 914 N.W.2d 678. We do not address petitioners' claim under the Wisconsin Constitution further.

and T.G. allege the adoption statutes are facially[7] unconstitutional because Wis. Stat. § 48.81 treats the children of single parents differently than children with two married parents and treats unmarried romantic partners differently than spouses. Petitioners claim these classifications are arbitrary and not rationally related to a valid state interest.

¶12 In reviewing the constitutionality of a statute under an equal protection analysis, the court first identifies the appropriate level of scrutiny. State v. Alger, 2015 WI 3, ¶39, 360 Wis. 2d 193, 858 N.W.2d 346. We consider whether the statute implicates a fundamental constitutional right or "whether a suspect class is disadvantaged by the challenged legislation." State v. Smith, 2010 WI 16, ¶12, 323 Wis. 2d 377, 780 N.W.2d 90. If either is true, the court generally[8] applies strict scrutiny. Id.

---

[7] During oral argument, counsel for A.M.B. and T.G. described their challenge to the statutes' constitutionality as a hybrid claim comprising both as-applied and facial equal protection challenges. She later argued the statutes could not be constitutionally applied under any circumstances. Because A.M.B. and T.G. narrowed their claim to a facial challenge, we confine our analysis to the facial constitutionality of the challenged statutes.

[8] The existence of a fundamental right does not automatically trigger strict scrutiny. "A law that implicates a fundamental right is not necessarily subject to strict scrutiny. Whether strict scrutiny applies sometimes depends on the degree to which the law burdens a fundamental right." State v. Alger, 2015 WI 3, ¶39 n.16, 360 Wis. 2d 193, 858 N.W.2d 346 (citation omitted).

¶13 If a fundamental constitutional right is not at stake and a protected class is not disadvantaged by the statute, the court applies rational basis review. A "relatively relaxed standard," rational basis review reflects the court's respect for the separation of powers and recognizes "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 314 (1976) (per curiam). In applying rational basis review, the court will uphold the statute provided the classification bears a rational relationship to a legitimate government interest. Blake, 370 Wis. 2d 1, ¶32.

A. Strict Scrutiny Does Not Apply

¶14 The adoption "legislative scheme does not affect a fundamental right and is not based on a suspect classification." Georgina G., 184 Wis. 2d at 518. In Georgina G., this court resolved a similar constitutional challenge to the adoption statutes, holding that Wis. Stat. §§ 48.81 and 48.92 did not violate the equal protection rights of a woman who wished to adopt her same-sex partner's child. Id. at 519. The court explained:

> The adoption statutes do not violate Annette's right to equal protection. Annette is eligible to adopt a child "whose parental rights have been terminated." That is not the case here. In addition, if Annette were married, she would be eligible to adopt the child(ren) of her spouse. Again, that is not the case here. The Wisconsin legislature has enacted a statutory scheme for adoption that balances society's interest in promoting stable, legally recognized families with its interest in promoting the best

9

interests of the children involved. The adoption proposed in this case does not fall within the confines of this constitutionally valid legislative scheme.

Id. at 518-19. T.G. is ineligible to adopt M.M.C. for the same reason Annette was ineligible to adopt her partner's child: T.G. is not married to M.M.C.'s mother. The court's reasoning in Georgina G. was sound, and we decline to overturn that precedent.[9]

¶15 The statutes do not implicate a fundamental right of either T.G. or M.M.C. A fundamental right is "deeply rooted in this Nation's history and tradition." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (citations omitted). Petitioners

---

[9] Petitioners ask this court to overturn Georgina G., which involved a same-sex couple legally prohibited from marrying at the time the opinion was issued. 184 Wis. 2d at 504 n.1. This court has repeatedly recognized the importance of stare decisis to the rule of law; for this reason, we require a special justification to overturn precedent. State v. Stephenson, 2020 WI 92, ¶¶32-33, 394 Wis. 2d 703, 951 N.W.2d 819. This court commonly considers whether a prior decision is "unsound in principle" when asked to overturn it. Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216. After this court decided Georgina G., the United States Supreme Court declared a constitutional right of same-sex couples to marry. See generally Obergefell v. Hodges, 576 U.S. 644 (2015). That change in the law does not undermine this court's reasoning in Georgina G., which did not turn on the couple's sexual orientation. As the court in Georgina G. explained, "Wisconsin's adoption statutes do not discriminate on the basis of sexual orientation or gender. Annette may not adopt Angel because Annette and Georgina are not married." 184 Wis. 2d at 518. Petitioners in this case fail to identify any developments in the law that undermine the court's decision in Georgina G.

fail to identify any right deeply rooted in our history or tradition upon which the statutes intrude.

¶16 As a preliminary matter, petitioners concede there is no fundamental right to adopt. "Adoption proceedings, unknown at common law, are of statutory origin and the essential statutory requirements must be substantially met to validate the proceedings." Tennessen v. Topel, 32 Wis. 2d 223, 229, 145 N.W.2d 162 (1966); Eugene M. Haertle, Wisconsin Adoption Law and Procedure, 33 Marq. L. Rev. 37, 37 (1949). This court previously recognized adoption as a "relatively recent statutory development," and not a practice traditionally protected by our society. Georgina G., 184 Wis. 2d at 516. The federal circuit courts that have addressed this question have uniformly held adoption is not a fundamental right. E.g., Adar v. Smith, 639 F.3d 146, 162 (5th Cir. 2011) (en banc); Lofton v. Sec'y of Dep't of Child. & Fam. Servs., 358 F.3d 804, 811-12 (11th Cir. 2004); Lindley v. Sullivan, 889 F.2d 124, 131 (7th Cir. 1989).

¶17 A.M.B. and T.G. argue the adoption statutes must withstand strict scrutiny because they implicate the fundamental right to marriage. While marriage is undoubtedly a fundamental right, Loving v. Virginia, 388 U.S. 1, 12 (1967), these statutes do not implicate that right. The statutes do not compel[10] A.M.B. and T.G. to marry, nor do the statutes prohibit them from

_____

[10] In their briefing, petitioners suggest the circuit court tried to force them to marry so that T.G. could adopt M.M.C. That is not accurate. In denying the adoption petition, the court noted that if T.G. married A.M.B., T.G. would qualify to adopt M.M.C. because the statutory criteria would be met.

11

marrying.  The adoption statutes do not impose any impediment to marriage, unlike laws at issue in other cases in which the United States Supreme Court has declared statutory restrictions on marriage unconstitutional.  See, e.g., id. at 2 (holding a "scheme adopted by the State of Virginia to prevent marriages between persons solely on the basis of racial classifications violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment"); Zablocki v. Redhail, 434 U.S. 374, 375-77 (1978) (Wisconsin law barring marriage, without court approval, for individual "'having minor issue not in his custody and which he is under obligation to support by any court order or judgment'" violated the Fourteenth Amendment).  In contrast, the adoption statutes challenged by A.M.B. and T.G. do not "control the selection of one's spouse." Roberts v. U.S. Jaycees, 468 U.S. 609, 620 (1984).

¶18 Far from impeding marriage, the adoption statutes privilege the institution.  Historically, states have provided benefits to married couples while denying them to unmarried individuals.  "Indeed, while the States are in general free to vary the benefits they confer on all married couples, they have throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities.  These aspects of marital status include:  taxation; inheritance and property rights; . . . [and] adoption rights . . . ." Obergefell v. Hodges, 576 U.S. 644, 669-70 (2015); Glucksberg, 521 U.S. at 721 (internal citation omitted) ("Our Nation's history, legal traditions, and practices thus provide the

12

crucial 'guideposts for responsible decisionmaking' that direct and restrain our exposition of the Due Process Clause."). As the United States Supreme Court has explained, the right to marry is fundamental——at least in part——because the state has historically provided benefits to married couples: "The States have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order." Obergefell, 576 U.S. at 670. Privileging a married spouse with the opportunity to adopt a child does not in any way infringe the right to marry.

¶19 Because adoption is not a fundamental right under our nation's history and tradition, and Wis. Stat. §§ 48.81 and 48.92(2) do not infringe the right to marry, we next consider whether the statutes implicate a suspect classification. The United States Supreme Court has identified distinctions based on race, national origin, and alienage as suspect classifications subject to strict scrutiny. Milwaukee Cnty. v. Mary F.-R., 2013 WI 92, ¶35, 351 Wis. 2d 273, 839 N.W.2d 581 (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).[11] The classifications established under Wis. Stat. § 48.81 do not fit any of those categories. "The Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so."

---

[11] In Obergefell, the United States Supreme Court did not make marital status a protected class; rather, it extended the fundamental right to marry to same-sex couples. 576 U.S. at 672.

13

_Ondo v. City of Cleveland_, 795 F.3d 597, 609 (6th Cir. 2015). Nothing in the Constitution supports elevating marital status to a protected class. A legislative classification based on marital status simply does not rise to the level of a suspect classification. See _Califano v. Jobst_, 434 U.S. 47, 53-54 (1977); _Smith v. Shalala_, 5 F.3d 235, 239 (7th Cir. 1993).

¶20 Wisconsin Stat. § 48.81 constructs distinct classifications for whom may be adopted and establishes eligibility based on the child's parental status. The statute in pertinent part provides:

> **Who may be adopted.** Any child who is present in this state at the time the petition for adoption is filed may be adopted if any of the following criteria are met:
>
> (1) Both of the child's parents are deceased.
>
> (2) The parental rights of both of the child's parents with respect to the child have been terminated under subch. VIII or in another state or a foreign jurisdiction.
>
> (3) The parental rights of one of the child's parents with respect to the child have been terminated under subch. VIII or in another state or a foreign jurisdiction and the child's other parent is deceased.
>
> (4) The person filing the petition for adoption is the spouse of the child's parent with whom the child and the child's parent reside and either of the following applies:
>
>> (a) The child's other parent is deceased.
>>
>> (b) The parental rights of the child's other parent with respect to the child have been terminated under subch. VIII or in another state or a foreign jurisdiction.

14

Wis. Stat. § 48.81(1)-(4).

¶21 A child is not eligible for adoption if she has an existing legal relationship with one of her parents. The statute provides but one exception to this rule: a stepparent may adopt the child of his spouse if the child's other parent is either deceased or his parental rights have been legally terminated. Wis. Stat. § 48.81(4)(a)-(b). M.M.C. is not eligible for adoption because her legal relationship with A.M.B. remains intact and T.G. is not M.M.C.'s stepparent because he is not married to A.M.B.

¶22 Wisconsin Stat. § 48.82(1) conditions a person's eligibility to adopt a child on the prospective adoptive parent's marital status. The statute provides in full:

> (1) The following persons are eligible to adopt a minor if they are residents of this state:
>
>> (a) A husband and wife jointly, or either the husband or wife if the other spouse is a parent of the minor.
>
>> (b) An unmarried adult.

Wis. Stat. § 48.82(1)(a)-(b). T.G. is an unmarried adult and M.M.C. is a minor child with one unmarried legal parent, A.M.B. As an unmarried adult, T.G. may not adopt M.M.C. because he is not married to A.M.B. and therefore does not meet the requirements of eligibility under Wis. Stat. § 48.82(1)(a).

¶23 If T.G. adopted M.M.C., Wis. Stat. § 48.92(2) would extinguish A.M.B.'s parental rights. Section 48.92 is titled "Effect of adoption" and subsection (2) states as follows:

15

> After the order of adoption is entered the relationship of parent and child between the adopted person and the adopted person's birth parents and the relationship between the adopted person and all persons whose relationship to the adopted person is derived through those birth parents shall be completely altered and all the rights, duties, and other legal consequences of those relationships shall cease to exist, unless the birth parent is the spouse of the adoptive parent, in which case those relationships shall be completely altered and those rights, duties, and other legal consequences shall cease to exist only with respect to the birth parent who is not the spouse of the adoptive parent and all persons whose relationship to the adopted person is derived through that birth parent.

(Emphasis added). Allowing the unmarried partner of a birth parent to adopt his partner's child with the parental rights of the birth parent intact would flout § 48.92(2), which permanently ends all rights and duties belonging to a birth parent——unless the adoptive parent is married to the birth parent.

¶24 The statutory criteria establishing eligibility to adopt or to be adopted do not involve any protected classes. Instead, Wis. Stat. § 48.81 conditions eligibility for adoption on whether a child retains a legal relationship with one of the child's parents, while Wis. Stat. § 48.82 conditions eligibility to adopt on an individual's marital status. Neither of these classifications are suspect under an equal protection analysis, and the state retains broad discretion to establish legislative classifications provided they have a reasonable basis. State v. Dennis H., 2002 WI 104, ¶32, 255 Wis. 2d 359, 647 N.W.2d 851 (citing State v. McManus, 152 Wis. 2d 113, 131, 447 N.W.2d 654

16

(1989)).   Wisconsin Stat. §§ 48.81, 48.82, and 48.92(2) collectively balance the interests of the state in ensuring a child eligible for adoption enjoys the stability of a marital family.   Because the statutes do not implicate a fundamental right or create a suspect classification, we apply rational basis review to the challenged statutes.[12]

### B.  The Statutory Classifications Have a Rational Relationship to the State's Interest in Promoting Stability for Adoptive Children.

¶25 Under rational basis review, this court will uphold legislatively chosen classifications provided the legislature has "reasonable and practical grounds for the classifications that it draws."  State v. Quintana, 2008 WI 33, ¶79, 308 Wis. 2d 615, 748 N.W.2d 447 (citing McManus, 152 Wis. 2d at 130).  A classification "does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" Dandridge v. Williams, 397 U.S. 471, 485 (1970) (quoting Lindsley v. Nat. Carbonic Gas Co., 220 U.S. 61, 78 (1911)).  In ascertaining the existence of a rational basis, the court is not

---

[12] The adoption statutes do not infringe A.M.B.'s fundamental liberty interest in raising M.M.C.  See Troxel v. Granville, 530 U.S. 57, 65 (2000).  A.M.B. may maintain her nonmarital relationship with T.G., and may allow T.G. to continue serving as a father figure for M.M.C.  The adoption statutes do not affect how A.M.B. chooses to raise her child, nor do they intrude on her constitutional right to direct the upbringing of M.M.C. free of governmental interference.  See Barstad v. Frazier, 118 Wis. 2d 549, 567-68, 348 N.W.2d 479 (1984).

limited to those grounds the legislature may have identified; rather, "it is the court's obligation to locate or to construct, if possible, a rationale that might have influenced the legislature and that reasonably upholds the legislative determination." Sambs v. City of Brookfield, 97 Wis. 2d 356, 371, 293 N.W.2d 504 (1980).

¶26 The United States Supreme Court has long recognized the significant societal benefits marriage provides. Obergefell, 576 U.S. at 669. The Obergefell Court explicitly acknowledged the significance of marriage for children in declaring, "[m]arriage . . . affords the permanency and stability important to children's best interests." Id. at 668. Because marriage supplies these advantages, the state has long conferred benefits on married couples in return: "[J]ust as a couple vows to support each other, so does society pledge to support the couple, offering symbolic recognition and material benefits to protect and nourish the union." Id. at 669. Individual states "have throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities." Id. at 670. The Obergefell Court specifically included adoption rights among those a state may regulate based on marital status. Id.

¶27 The adoption statutory scheme creates reasonable eligibility criteria to promote the government's interest in children being adopted into stable, permanent home environments. Wisconsin Stat. § 48.81(1) permits a minor child to be adopted if both of her biological parents are deceased, while § 48.81(2)

18

permits adoption if the parental rights of both parents have been terminated. A child with one living parent may be adopted by the spouse of the child's parent. § 48.81(4). The state presented several justifications establishing a rational relationship between this legislative scheme and legitimate government interests, including the state's interest in promoting financial stability for adoptive children.

¶28 The state has a legitimate interest in ensuring children are adopted into "safe and stable families." Wis. Stat. § 48.01(1)(gg). The state may achieve this goal by encouraging married couples to adopt children and the legislature recognized the essential link between marriage and the welfare of children in "The Family Code." Wis. Stat. § 765.001(1). Marriage in the State of Wisconsin creates a legal bond between two persons who "owe to each other mutual responsibility and support." § 765.001(2). This legal bond creates a series of rights and obligations between the two individuals, dissolvable only by death or divorce. Wisconsin law imposes on each spouse "an equal obligation" in accordance with financial ability "to contribute money or services or both which are necessary for the adequate support and maintenance of" the couple's "minor children and of the other spouse." § 765.001(2). The state deems "[t]he consequences of the marriage contract" to be "more significant to society than those of other contracts." § 765.001(2). Unlike a nonmarital relationship, the legal union between two individuals through marriage cannot be terminated impulsively or spontaneously; the

19

law requires a court proceeding to terminate the contractual relationship. If a child already has a legal parent, the state reasonably concludes it would be more beneficial for that child to be adopted into a marital family, rather than by an unmarried partner of the child's legal parent. As the state argued in its brief, the fact that marriage requires legal proceedings to terminate provides "some level of assurance" the adoptive stepparent "will remain committed to the family unit and the child's upbringing."

¶29 A child joining a family with married parents enjoys a greater likelihood of a financially stable upbringing compared to a household with two unmarried parents. In the event of a divorce, Wisconsin statutes create a presumption guaranteeing both marital partners leave the relationship on financially equivalent footing. Wis. Stat. § 767.61(3). This presumption "effectuates the policy that each spouse makes a valuable contribution to the marriage and that each spouse should be compensated for his or her respective contributions." Steinke v. Steinke, 126 Wis. 2d 372, 380-81, 376 N.W.2d 839 (1985). Nothing comparable exists for unmarried couples. If an unmarried partner decides to sever the relationship, he may freely leave without an equal division of financial assets, to the financial detriment of the remaining parent and the adoptive child. Rational basis review is a "low bar" for the government to clear in an equal protection challenge. Tiwari v. Friedlander, 26 F.4th 355, 362 (6th Cir. 2022). In this case, the state has met this burden because it is reasonable for the

legislature to have concluded that a married couple would provide a more secure and financially stable home environment for adoptive children than an unmarried couple.

¶30  While A.M.B. and T.G. may provide a safe, stable, healthy, and loving home for M.M.C., the judiciary is powerless to craft an exception to the adoption law on a case-by-case basis.  "A legislative classification satisfies rational basis review if any conceivable state of facts could provide a rational basis for the classification."  Alger, 360 Wis. 2d 193, ¶50 (cleaned up).  Petitioners cannot overcome the rational basis for the classifications established in the adoption statutes.  Wisconsin has a legitimate interest in preferring the stability and security of a marital household for the upbringing of adopted children.  See Lofton, 358 F.3d at 819.  The statute's classifications for whom may adopt a child reflects the state's interest in preferring stable and financially secure households for adoptive children.

¶31  Petitioners argue the state draws an arbitrary and irrational distinction by permitting a single, unmarried adult to adopt a child but not a cohabiting, unmarried partner. Compare Wis. Stat. § 48.82(1)(b) with Wis. Stat. § 48.81(4).  We disagree.  The legislative classifications bear a rational basis because the state may reasonably prefer a child to be adopted by a single, unmarried adult rather than be placed in foster care or another impermanent living arrangement.  See Wis. Stat. § 48.01(1)(ag) (recognizing "that children have certain basic needs which must be provided for, including . . . the need for a

21

safe and permanent family").  Because a child with one parent has permanency, the state has a legitimate interest in restricting adoption to the child's stepparent, who is more likely to provide a stable family and better outcomes for the child.  Allowing married couples to adopt but not unmarried couples is consistent with the "public policy" of the state "to promote the stability of marriage and family."  County of Dane v. Norman, 174 Wis. 2d 683, 689, 497 N.W.2d 714 (1993).

¶32  By allowing married couples to adopt but not unmarried couples, the state provides a benefit to married couples not afforded to unmarried couples.  States "have throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities."  Obergefell, 576 U.S. at 670.  Precluding an individual from adopting his nonmarital partner's child merely makes marriage a basis for the adoption right, a classification rooted in our nation's history.  Limiting adoption to married couples and single adults is neither irrational nor arbitrary because the state has legitimate reasons for the legislative classifications established under Wis. Stat. § 48.81.

¶33 Under rational basis review, the court does not judge the wisdom of the legislative classifications.  Tomczak v. Bailey, 218 Wis. 2d 245, 265, 578 N.W.2d 166 (1998).  Instead, we must uphold the statute's classification if there exists some rationale to justify it.  Id.  In establishing eligibility to adopt or to be adopted, the legislature chose to prioritize the stability of marriage for adopted children with one parent,

while preferring an unmarried adoptive parent to impermanency for a child with no parents. A rational basis exists for these legislative policy choices. We hold that Wis. Stat. §§ 48.81 and 48.92(2) do not violate the Equal Protection Clause because they serve the legitimate state interest in promoting the adoption of children into stable, marital families.

## IV. CONCLUSION

¶34 The Supreme Court has declared, "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Because the legislative classifications restricting adoption do not infringe a fundamental right or affect a protected class, we consider only whether any rational basis exists for the legislative limits on eligibility to adopt a child. Because the state has a legitimate interest in promoting stability for adoptive children through marital families, petitioners' equal protection challenge to Wisconsin's adoption statutes fails.

*By the Court.*—The judgment and order of the circuit court are affirmed.

¶35 REBECCA GRASSL BRADLEY, J. *(concurring).* For most of the history of the United States, constitutional-rights litigation occurred predominantly in state courts and centered on state constitutional rights. Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 13 (2018). It's no wonder why. The individual rights protected by the United States Constitution did not originally apply to the states. Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243, 250-51 (1833). Regardless, all individual rights protected under the Constitution originated from the guarantees of liberty embodied in state constitutional provisions. Sutton, supra, at 11. Even the practice of judicial review——the main vehicle by which citizens vindicate their liberties——originated in state courts. Id. at 13.

¶36 Invoking state constitutional rights, however, has been out of vogue for some time. Such claims have sometimes been relegated to "second-tier status," id. at 9, and an afterthought in legal briefs. Many commentators have noted the decline in the centrality of state constitutional claims as the United States Supreme Court federalized constitutional rights during the Warren Court era. E.g., Clint Bolick, Principles of State Constitutional Interpretation, 53 Ariz. St. L.J. 771, 774-75 (2021); Hans A. Linde, E Pluribus——Constitutional Theory and State Courts, 18 Ga. L. Rev. 165, 174-75 (1984). Over the course of the twentieth century, and especially in the 1960s, the Court incorporated most federal constitutional rights

1

against the states through the Fourteenth Amendment. Sutton, *supra*, at 13. As incorporation occurred, the Court also developed expansive——and novel——interpretations of the Constitution. As Justice William Brennan put it, the Court "fundamentally reshaped the law of this land" by "nationaliz[ing] civil rights." William J. Brennan Jr., The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights, 61 N.Y.U. L. Rev. 535, 540 (1986) [hereinafter The Bill of Rights and the States]. As a result, the relevance of state constitutions appeared to fade. Litigants stopped arguing their cases under state constitutions. See Bolick, *supra*, at 778 (noting state courts cannot "address constitutional issues if litigators do not raise, preserve, and meaningfully develop them"). Some state courts interpreted their state constitutions in lockstep with the federal courts' interpretation of the Federal Constitution. See generally, Sutton, *supra*, at 174 (defining "lockstepping" as "the tendency of some state courts to diminish their constitutions by interpreting them in reflexive imitation of the federal courts' interpretation of the Federal Constitution").

¶37 In recent years, a newfound interest in asserting state constitutional rights has emerged, which, in theory, should benefit individual liberty. State constitutional rights are just as important and worthy of protection as federal constitutional rights. And this court has a duty to enforce the rights protected under the Wisconsin Constitution. State v.

2

Halverson, 2021 WI 7, ¶23, 395 Wis. 2d 385, 953 N.W.2d 847 (citing State v. Jennings, 2002 WI 44, ¶¶18, 38, 252 Wis. 2d 228, 647 N.W.2d 142) ("While we must follow the United States Supreme Court on matters of federal law, we have an independent responsibility to interpret and apply the Wisconsin Constitution."); King v. Vill. of Waunakee, 185 Wis. 2d 25, 59-60, 517 N.W.2d 671 (1994) (Heffernan, C.J., dissenting).

¶38 Not all arguments for enforcing state constitutional rights are rooted in text, history, and tradition; some stem from disappointment with the outcomes in certain United States Supreme Court decisions. Negative reaction to the Burger, Rehnquist, and Roberts Courts' reluctance to "innovate" new federal constitutional rights, Sutton, supra, at 15, triggered a resurgence of interest by litigants and legal commentators in asking state courts to fill the gap. For example, in two famous law review articles, Justice William Brennan urged state courts to "step into the breach" created by the Court, William J. Brennan Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 503 (1977), and argued that "activist intervention[s]" into democratic governance are less problematic when done by state courts. Brennan, The Bill of Rights and the States, supra, at 551. The pressure on state courts to intrude on the democratic process has intensified with the Court's landmark decisions in Rucho v. Common Cause, 588 U.S. 684 (2019) (political gerrymandering), and Dobbs v. Jackson Women's Health Organization, 597 U.S. 215 (2022) (abortion).

¶39 Channeling the spirit of Justice William Brennan, Justice Rebecca Dallet argues this court should abandon its past practice of construing Article I, Section 1 of the Wisconsin Constitution to provide substantially identical protections as the Fourteenth Amendment. Blake v. Jossart, 2016 WI 57, ¶28, 370 Wis. 2d 1, 884 N.W.2d 484 ("As a general principle, this court treats these provisions of the United States and Wisconsin Constitutions as consistent with each other in their due process and equal protection guarantees."). Instead, she invites litigants to ask this court to invent constitutional rights: "[T]he lack of settled case law [discussing Article I, Section 1] should be encouraging to litigants. It is up to us——judges, lawyers, and citizens——to give effect to the fundamental guarantees of Article I, Section 1." Justice Dallet's concurrence, ¶59. As a pivotal part of her call for activism, Justice Dallet claims this court has embraced a "pluralistic approach" to constitutional interpretation in which this court "balance[s] the majority's values against the values that should be protected from society's majorities." Id., ¶53 (internal quotation marks omitted) (quoting Wis. Just. Initiative, Inc. v. Wis. Elections Comm'n, 2023 WI 38, ¶117, 407 Wis. 2d 87, 990 N.W.2d 122 (Dallet, J., concurring)). Nothing could be further from the truth or more corrosive to our democratic form of government.

¶40 It is not for judges to superimpose their values on the constitution. The Wisconsin Constitution's text "is the very product of an interest balancing by the people," which

4

judges cannot "conduct for them anew" in each case. District of Columbia v. Heller, 554 U.S. 570, 635 (2008). The balance struck by the people of Wisconsin, as embodied in the constitution, "demands our unqualified deference." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 26 (2022). What the constitution does not say is as important as what it says. If the constitution itself does not bar majorities from passing certain laws, there is no lawful basis for judges to say otherwise. Nothing in the constitution authorizes judges to void laws that violate some judges' sense of what ought to be. There is a good reason jurists "seldom endorse[]" the views espoused by Justice Dallet openly: They contradict "the basic democratic theory of our government." John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 44-45 (1980).

¶41 Justice Dallet attempts to conceal her call for an antidemocratic power grab with the illusion of inclusive language. She intimates that future generations must each decide for themselves what the constitution means in their time: "It is up to us—judges, lawyers, and citizens—to give effect to" the constitution's words today. Justice Dallet's concurrence, ¶59 (emphasis added). When the president of Wisconsin's 1848 convention said "the pages of our constitution . . . abound[] in the declaration of those great principles which characterize the age in which we live," The Attainment of Statehood 883 (Milo M. Quaife ed., 1928), he did not mean to characterize the constitution as an empty vessel

5

into which each generation may pour its prejudices and aspirations. He meant exactly what he said. The new constitution embodied the values and principles of that time, and those principles were to remain fixed and endure throughout the ages: "[The Wisconsin Constitution] abounds in the declaration of those great principles which characterize the age in which we live, and which, under the protection of Heaven, will——nay, must——guard the honor, promote the prosperity, and secure the permanent welfare of our beloved country." Id.

¶42 Justice Dallet ultimately advocates for the discredited "practice of constitutional revision" by a committee of four lawyers who happen to form a majority on the court. Obergefell v. Hodges, 576 U.S. 644, 714 (2015) (Scalia, J., dissenting). Should a majority of this court——four lawyers—— decide to imbue the constitution with modern meanings divorced from the constitutional text and the history and traditions of this state, they will rob the people of Wisconsin of their most important liberty: "the freedom to govern themselves." Id. Although living constitutionalism is often couched in the rhetoric of flexibility and a purported need to adjust for a changing society, in practice it presents a grave threat to democracy by thwarting the people from passing legislation to accommodate changing views. Living constitutionalism invites lawyers donning robes to decide all the important issues of the day, removing their resolution from the political process altogether and depriving the people of any say in such matters. "In practice, the Living Constitution would better be called the

6

Dead Democracy." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 410 (2012).[1]

¶43 Justice Dallet's invitation to reimagine the constitution's text with a so-called "pluralistic approach"[2] flies in the face of this court's established method of constitutional interpretation and should be rejected.[3] As with statutory interpretation, the goal of constitutional interpretation is to ascertain the meaning of the constitutional text as it would have been understood by those who adopted it. Wis. Just. Initiative 407 Wis. 2d 87, ¶21; State ex rel. Weiss v. Dist. Bd., 76 Wis. 177, 195-96, 44 N.W. 967 (1890); State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 184, 204 N.W. 803 (1925); B.F. Sturtevant Co. v. O'Brien, 186 Wis. 10, 19, 202 N.W. 324 (1925); State ex rel. Bond v. French, 2 Pin. 181, 184 (Wis. 1849); State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Judges lack any

---

[1] If nothing else, the idea of the living constitution is self-defeating. A constitutional right that can be "redefined" by a majority of the court from time to time is a "guarantee that guarantees nothing at all." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 407 (2012). What the court gives, the court can just as easily take away.

[2] Justice Dallet's concurrence, ¶53.

[3] Although Justice Dallet implies her approach is the traditional interpretive method of this court, id., just last term this court rebutted that assertion and conclusively rejected her approach. Wis. Just. Initiative, Inc. v. Wis. Elections Comm'n, 2023 WI 38, ¶¶22 n.6, 23 n.7, 407 Wis. 2d 87, 990 N.W.2d 122 ("The concurrence's open pining for the freedom to go beyond the meaning of constitutional language must be and is rejected.").

authority to "rewrite the Constitution to reflect the[ir] views and values." State v. C. G., 2022 WI 60, ¶87, 403 Wis. 2d 229, 976 N.W.2d 318; Wis. Just. Initiative, 407 Wis. 2d 87, ¶21; State v. Hoyle, 2023 WI 24, ¶88, 406 Wis. 2d 373, 987 N.W.2d 732 (Hagedorn, J., concurring) ("Our founders did not establish a system of government where judges in our highest courts are unconstrained by the meaning of the law the people have enacted, free to import their own values into the Constitution."). As stated by Justice Cassoday in 1890:

> It is no part of the duty of this court to make or unmake, but simply to construe this provision of the constitution. All questions of political and governmental ethics, all questions of policy, must be regarded as having been fully considered by the convention which framed, and conclusively determined by the people who adopted, the constitution, more than 40 years ago. The oath of every official in the state is to support that constitution as it is, and not as it might have been.

Weiss, 76 Wis. at 208 (Cassoday, J., concurring).

¶44 Constitutional interpretation focuses on the text of the constitution: "The authoritative, and usually final, indicator of the meaning of a provision is the text——the actual words used." Coulee Cath. Schs. v. LIRC, 2009 WI 88, ¶57, 320 Wis. 2d 275, 768 N.W.2d 868. Accordingly, "we look first to the plain meaning of the word[s] [of the constitution] in the context in which [they are] used." Bd. of Ed. v. Sinclair, 65 Wis. 2d 179, 182, 222 N.W.2d 143 (1974). This court has often consulted dictionaries contemporaneous with the text's adoption to help ascertain its meaning. E.g., id.; Weiss, 76 Wis. at 212 (Cassoday, J., concurring). As in statutory interpretation,

8

this court does not engage in a "hyper-literal approach." Brey v. State Farm Mut. Auto. Ins. Co., 2022 WI 7, ¶13, 400 Wis. 2d 417, 970 N.W.2d 1. Instead, the text is "read[] [] reasonably, in context, and with a view of the provision's place within the constitutional structure." Wis. Just. Initiative, 407 Wis. 2d 87, ¶21 (citing Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946 N.W.2d 35).

¶45 The debates over a constitutional provision and the practices at the time of the provision's adoption also serve as guides in ascertaining the text's original public meaning. Wis. Just. Initiative, 407 Wis. 2d 87, ¶21; Sinclair, 65 Wis. 2d at 182-83. As explained in State ex rel. Owen v. Donald, "we must strive by all means within our jurisdiction to put ourselves in the place the constitution makers occupied,——look at the situation they had in view through the same vista they observed it, and then read out of the term the meaning they sought to embody in it." 160 Wis. 21, 81, 151 N.W. 331 (1915).

¶46 Post-enactment construction of a constitutional provision by the other branches of government may also shed light on a provision's original public meaning. Sinclair, 65 Wis. 2d at 184; Thompson v. Craney, 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996); State ex rel. Kaul v. Prehn, 2022 WI 50, ¶49, 402 Wis. 2d 539, 976 N.W.2d 821 (statutes enacted "immediately after the 1848 constitution was ratified[] reveal[ed] a circumscribed understanding of the Governor's appointment power"). Legislative or executive action is given more weight if the action occurred shortly after the adoption of the

9

constitutional provision. See Prehn, 402 Wis. 2d 539, ¶49. Moreover, an "uninterrupted practice . . . prevailing through a long series of years" provides additional evidence as to the text's meaning. Dean v. Borchsenius, 30 Wis. 237, 246 (1872). "Lawbreaking is none the less lawbreaking because it is grayheaded with age, but when the meaning of a doubtful clause is in question, the construction placed upon it by the fathers, and concurred in through long years without question, is strongly persuasive and frequently will be held to be controlling." In re Appointment of Revisor, 141 Wis. 592, 602-03, 124 N.W. 670 (1910) (citing State ex rel. Bashford v. Frear, 138 Wis. 536, 120 N.W. 216 (1909)). Failure to present this court with historical research may be "fatal" to a party's position. Prehn, 402 Wis. 539, ¶44; Halverson, 395 Wis. 2d 385, ¶26 (rejecting a claim under the Wisconsin Constitution because the party "provide[d] no textual or historical basis" for his argument).

¶47 Any argument construing Article I, Section 1 of the Wisconsin Constitution to protect an asserted right must be grounded in the constitution's actual text and history. "Certainly, states have the power to afford greater protection to citizens under their constitutions than the federal constitution does." State v. Roberson, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813 (citing Herb v. Pitcairn, 324 U.S. 117, 125 (1945)). But it cannot simply be assumed that the Wisconsin Constitution provides more protection for an asserted right than the Federal Constitution: "[T]he question for a

10

state court is whether its state constitution actually affords greater protection. A state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning." Id.; Linde, supra, at 179. This court has stated many times that "[i]n interpreting a constitutional provision, the court turns to three sources in determining the provision's meaning: the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption." Craney, 199 Wis. 2d at 680 (first citing Polk Cnty. v. State Pub. Def., 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994); and then citing State v. Beno, 116 Wis. 2d 122, 136-37, 341 N.W.2d 668 (1984)); see also Thomas ex rel. Gramling v. Mallett, 2005 WI 129, ¶122, 285 Wis. 2d 236, 701 N.W.2d 523 (citing State v. Hamdan, 2003 WI 113, ¶64 n.29, 264 Wis. 2d 433, 665 N.W.2d 785); Vincent v. Voight, 2000 WI 93, ¶30, 236 Wis. 2d 588, 614 N.W.2d 388 (citation omitted); Wagner v. Milwaukee Cnty. Election Comm'n, 2003 WI 103, ¶18, 263 Wis. 2d 709, 666 N.W.2d 816 (citing State v. City of Oak Creek, 2000 WI 9, ¶18, 232 Wis. 2d 612, 605 N.W.2d 526); Koschkee v. Taylor, 2019 WI 76, ¶23, 387 Wis. 2d 552, 929 N.W.2d 600 (citation omitted); State v. Kerr, 2018 WI 87, ¶19, 383 Wis. 2d 306, 913 N.W.2d 787 (citing State v. Williams, 2012 WI 59, ¶15, 341 Wis. 2d 191, 814 N.W.2d 460). Litigants asserting a right under Article I, Section 1 must ground their arguments in those

11

considerations——not policy or subjective moral judgments. Our constitution and our commitment to a democratic form of government demand nothing less.

¶48 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice BRIAN HAGEDORN join this concurrence.

¶49 REBECCA FRANK DALLET, J. *(concurring)*. I agree with the majority's conclusion that the adoption statutes, Wis. Stat. §§ 48.81 and 48.92(2), are rationally related to a legitimate state interest, and therefore do not violate M.M.C.'s or T.G.'s rights under the Equal Protection Clause of the Fourteenth Amendment. For that reason, I join the majority opinion.

¶50 I write separately to address petitioners' alternative equal protection challenge under Article I, Section 1 of the Wisconsin Constitution. Our constitution was written independently of the United States Constitution and we must interpret it as such, based on its own language and our state's unique identity. When we do so, there are several compelling reasons why we should read Article I, Section 1 as providing broader protections for individual liberties than the Fourteenth Amendment. We cannot simply assume—as petitioners seemingly did in this case—that these different constitutional provisions mean the same thing.

I

¶51 Since the earliest days of our state's history, we have embraced our role as the principal interpreters of our state constitution. In <u>Attorney General ex rel. Bashford v. Barstow</u>, 4 Wis. 567, 785 (1855), Justice Abram Smith said "The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs—let us construe, and stand by ours." And we have repeatedly declared

1

that it is our duty to interpret our constitution independently of the United States Constitution. See, e.g., State v. Ward, 2000 WI 3, ¶59, 231 Wis. 2d 723, 604 N.W.2d 517; State v. Jennings, 2002 WI 44, ¶38, 252 Wis. 2d 228, 647 N.W.2d 142; State v. Halverson, 2021 WI 7, ¶23, 395 Wis. 2d 385, 953 N.W.2d 847. "Fulfilling our duty to uphold the Wisconsin Constitution as written could yield conclusions affording greater protections than those provided by the federal Constitution." Halverson, 395 Wis. 2d 385, ¶23.

¶52 In fact, we have a long history of interpreting our constitution to provide greater protections for the individual liberties of Wisconsinites than those mandated by the federal Constitution. For example, we concluded that the Wisconsin Constitution guarantees the right to counsel at the state's expense in criminal cases more than 100 years before the United States Supreme Court recognized the same right in Gideon v. Wainwright, 372 U.S. 335 (1963). See Carpenter v. Dane County, 9 Wis. 274, 278 (1859). More than 40 years before Mapp v. Ohio, 367 U.S. 643 (1961), we held that suppression was the appropriate remedy for unlawful searches and seizures under our constitution. See Hoyer v. State, 180 Wis. 407, 415, 193 N.W. 89 (1923). And we have also said that when police deliberately violate a criminal defendant's Miranda[1] rights, our constitution requires that the evidence be suppressed, even if the Fourth Amendment doesn't require the same. See State v. Knapp, 2005 WI 127, ¶2, 285 Wis. 2d 86, 700 N.W.2d 899. More recently, we have

_____

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

2

endorsed the view that "[t]he Wisconsin Constitution, with its specific and expansive language, provides much broader protections for religious liberty than the First Amendment." Coulee Cath. Schs. v. LIRC, 2009 WI 88, ¶66, 320 Wis. 2d 275, 768 N.W.2d 868.

¶53 As these examples illustrate, we have recognized greater protections for individual liberties in our constitution because it is meaningfully different than the federal Constitution. "All of the differences in our state constitutions are not accidents of draftsmanship. Some of these differences reflect differences in our tradition." Shirley S. Abrahamson, Reincarnation of State Courts, 36 Sw. L.J. 951, 966 (1982). The Wisconsin Constitution reflects the unique features of our state and its laws, our history, and the "distinctive attitudes of [our] state's citizenry." See Developments in the Law——The Interpretation of State Constitutional Rights, 95 Harv. L. Rev. 1324, 1359-61 (1982). We must consider these differences——both textual and contextual——as part of the pluralistic approach to state constitutional interpretation we have applied previously. See Wis. Justice Initiative v. Wis. Elections Comm'n, 2023 WI 38, ¶117, 407 Wis. 2d 87, 990 N.W.2d 122 (Dallet, J., concurring) ("We should analyze the . . . Wisconsin constitution['s] text and history carefully, but we should also be guided by precedent, context, historical practice and tradition, and the need to balance 'the majority's values against the values that should be protected from society's majorities'" (quoting another source)).

3

II

¶54 Even a cursory review of Article I, Section 1 of our constitution and the Fourteenth Amendment indicates that the clauses have different meanings. Article I, Section 1 states, in its entirety:

> All people are born equally free and independent, and have certain inherent rights: among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

Wis. Const. art. I, § 1. Compare this with the Fourteenth Amendment which provides in pertinent part that "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

¶55 Aside from two shared words——"life" and "liberty"—— Article I, Section 1 and the Fourteenth Amendment are worded in dramatically different ways. Article I, Section 1 protects more than the enumerated rights of "life, liberty, or property." It declares unequivocally that all Wisconsinites have "inherent rights," a phrase that was written "to be broad enough to cover every principle of natural right, of abstract justice." Black v. State, 113 Wis. 205, 226, 89 N.W. 522 (1902) (Marshall, J., concurring). Whereas the Fourteenth Amendment's protections extend only to those rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental," the inherent rights contemplated by Article I, Section 1 are not so limited. Reno v. Flores, 507 U.S. 292, 303 (1993). Moreover,

4

Article I, Section 1 begins with the clear and expansive declaration that all people are "born equally free and independent." Wis. Const. art. I, § 1. As we said over a century ago, "[t]oo much dignity cannot well be given to that declaration." State v. Redmon, 134 Wis. 89, 101, 114 N.W. 137 (1907). By contrast, the Fourteenth Amendment contains a narrower guarantee of "equal protection of the laws." U.S. Const. amend. XIV, § 1.

¶56 These textual differences are unsurprising when we consider the divergent historical contexts in which the clauses were developed and adopted. The language of Article I, Section 1 is derived from the Virginia Declaration of Rights, which stated:

> That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.

Virginia Declaration of Rights, § 1 (1776).

¶57 That language, and the language it also inspired in the overwhelming majority of other states' constitutions,[2] was "a statement of revolutionary, republican, egalitarian ideology . . . [b]ut it did not concern itself with the

---

[2] See, e.g., Vermont Const. ch. I, art. 1; Mass. Const. art. I; N.H. Const. art. I; see also Steven G. Calabresi, et al., Individual Rights Under State Constitutions in 2018: What Rights Are Deeply Rooted in a Modern-Day Consensus of the States?, 94 Notre Dame L. Rev. 49, 125 (2018) (noting that "[t]hirty-nine of the states—representing 78% of the states" have similar language in their state constitutions).

5

Fourteenth Amendment era problems of the people being denied the equal protection of the laws[.]" Robert F. Williams, A "Row of Shadows": Pennsylvania's Misguided Lockstep Approach to Its State Constitutional Equality Doctrine, 3 Widener J. Pub. L. 343, 349 (1993). The Fourteenth Amendment wasn't ratified until twenty years after Wisconsin achieved statehood and nearly a century after virtually identical language first appeared in the Virginia Declaration of Rights. Far from the "revolutionary" ideals that our Wisconsin Constitution protects, the Fourteenth Amendment was a pragmatic step in the aftermath of the Civil War to protect the rights of African Americans who had been freed from slavery. See Jonathan F. Mitchell, Textualism and the Fourteenth Amendment, 69 Stan. L. Rev. 1237, 1248 (2017). The politics of 1868 would have been unrecognizable to the delegates to the 1848 Wisconsin constitutional convention, let alone the drafters of the Virginia Declaration of Rights in 1776. In short, the leaders of different sovereigns adopted different language at different times in history to address different problems. And for that reason, we should refrain from reflexively treating the language similarly.

III

¶58 Notwithstanding the many reasons to interpret our state constitution differently than the federal Constitution, litigants often overlook state constitutional claims, or fail to develop them fully. This case is a perfect example. Although petitioners argued that the adoption statutes at issue violate Article I, Section 1 of the Wisconsin Constitution, they offered

little more than a citation to that section as support. Otherwise, the parties' briefs focused solely on the Fourteenth Amendment and federal precedent, and ignored the Wisconsin Constitution entirely.

¶59 That omission is somewhat understandable. Lawyers are surely more familiar with the extensive case law interpreting the Fourteenth Amendment. By comparison, our case law regarding Article I, Section 1 is sparse. But we must break this self-perpetuating cycle whereby lawyers fail to develop state constitutional arguments because they lack clear legal standards, which further prevents courts from developing clear legal standards. In a way, the lack of settled case law should be encouraging to litigants. It is up to us——judges, lawyers, and citizens——to give effect to the fundamental guarantees of Article I, Section 1. And in doing so, I agree with what Justice Dodge wrote more than 100 years ago, when he said that Article I, Section 1, should "not receive an unduly limited construction." State ex rel. Zillmer v. Kreutzberg, 114 Wis. 530, 533-34, 90 N.W. 1098 (1902) (internal quotations omitted).

¶60 For the foregoing reasons, I respectfully concur.

¶61 I am authorized to state that Justices ANN WALSH BRADLEY and PROTASIEWICZ join this concurrence.

¶62 JILL J. KAROFSKY, J.   *(concurring).*  I agree with the majority that A.M.B.'s constitutional challenge merits rational basis review and that the challenged adoption statutes have a rational basis under the law.  Rational basis review presents a low bar for the state to clear.  We need only to conceive of a single rational connection between the statutes and a legitimate state interest in order for us to uphold the statutes' constitutionality.  Here it is rational for the legislature to connect marriage to relationship longevity, then relationship longevity to household stability, and finally household stability to the child's best interest.[1]  Because there is a conceivable logic behind those connections, the statutes have a rational basis.

¶63 But in this case, the logical threads begin to shred under the weight of any sincere scrutiny.  Here, we are left with the inescapable fact that the legally rational statutes prevented an adoption that all agree would have been in A.M.B.'s best interest.   This incongruent outcome exemplifies the specious connection between the statutes and their stated goal of promoting a child's best interest.  At first glance the connection may seem neatly knitted together; however, closer inspection reveals nothing more than a fraying tangle of dubious assumptions, circular reasoning, and outdated values that fail to reflect the practical realities of modern family life.   I write separately to call out these three fraying threads that

---

[1] See Wis. Stat. § 48.01(1) ("In construing this chapter, the best interests of the child or unborn child shall always be of paramount consideration.").

1

form an ever weakening connection between our adoption statutes and the goal of a child's best interest. I urge the legislature to reform the adoption restrictions so that they truly support the best interest of every child.

¶64 The first fraying thread connecting the adoption statutes to the best interest of a child is a set of dubious assumptions regarding the stability of marital families compared to non-marital families. To be clear, the state has a legitimate interest in making sure that legal decisions involving a child are made based on the best interest of that child. And there is no doubt that it is in a child's best interest to grow up in a safe and stable household. However, conditioning adoption on the marital status of the child's parent and prospective adoptive parent reflects questionable assumptions about which types of households are stable, and which are unstable. There are many different family structures that create stability for children, and the statute's one-size-fits-all approach can actively work against the benefit of a child, as it did in this case.

¶65 Children can and do thrive in families with single, unmarried, or married parents.[2] This case is an excellent example of the second category. T.G. has, by all accounts, demonstrated dedication and commitment to A.M.B. over the past

---

[2] These former two categories are not rare, with 41% of children born to unmarried or single households between 2015 and 2021. Robert Schoen, A Multistate Analysis of United States Marriage, Divorce, and Fertility, 2005-2010 and 2015-20: The Retreat from Marriage Continues, The Demography of Transforming Families 119, 119 (2023).

decade, and for her part A.M.B. reports that she views T.G. as a father figure. There is no dispute that adoption would be in A.M.B.'s best interest.

¶66 Moreover, children can and do struggle in households with married parents. Married couples may, on average, stay together in the same household longer than unmarried parents, and that may look like stability from a thousand-foot-view. But inside the home, the legal pressure for a married couple to stay together, the very thing that makes the household appear stable in a superficial sense, may sometimes lead to worse outcomes for children. More than 20% of children have witnessed domestic violence within their lifetime, often resulting in long term harm to their development. David Finkelhor et al. Violence, Abuse and Crime Exposure in a National Sample of Children and Youth, 124 Pediatrics 1, 5 (2009). Even short of domestic violence, legally "stable" marriages may be rife with stressors for the children in those homes. Bali Ram & Feng Hou, Changes in Family Structure and Child Outcomes: Roles of Economic and Familial Resources, 31 Pol'y Stud. J. 309, 312 ("[A] large body of research now exists that finds that children are not necessarily better off living with two biological parents who are in constant marital conflict."). Even ignoring the challenges that may arise when a married couple remains together, marriage is hardly a guarantee of relationship stability given that divorce rates have continued to rise in the United States since the Civil War. Lisa D. Pearce et al., The

Increasing Diversity and Complexity of Family Structures for Adolescents, 23 J. Rsch. on Adolescence 565, 592 (2018).

¶67 In short, using marriage as a litmus test for household stability reflects suspect assumptions about which family structures create stability, and what it means for a household to be stable in the first place. Marriage is treated as binary, where married parents check the stability box, unmarried parents do not, and all nuance is disregarded as insignificant. In cases such as this where unmarried parents provide stability, there is no tolerance for any exception. And, as a result, children suffer.

¶68 The second frayed thread linking the adoption statutes to the best interest of the child goal is little more than tail-wagging-the-dog circular reasoning. It goes like this: The state grants a "constellation of benefits" to married couples related to "taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decision making authority," and more. See Obergefell v. Hodges, 576 U.S. 644, 669-70 (2015). The state then uses those benefits as justification to grant yet another benefit to married couples—here, adoption rights— reasoning that because married couples are already well-supported by the state, they are in a better position to receive the new benefit. The connection between the granting of the benefit and the state's goals is thus substantially manufactured by the state, resulting in a spiral of ever-expanding benefits to married couples, leaving alternative family structures

4

further and further behind. Perhaps the answer then is not to limit adoption benefits to married couples on the basis that the other benefits they receive make them "safe and stable,"[3] but for the legislature to expand support for alternative family structures, making them even more "safe and stable," and (from the state's point of view) suitable for adopting children.

¶69 The third unraveling thread is an outdated set of values positioning marriage as the moral center of family and society. These values sometimes lurk beneath other seemingly neutral rationales for marital benefits (such as ensuring household stability), only surfacing occasionally as a reminder to us that they are still there. Sometimes these values are front and center, serving as the main justification for a marriage-based distinction under the law.

¶70 To explain what is fundamentally wrong with using this set of values to justify marriage-based laws, I turn to an 1888 U.S. Supreme Court case, cited by the Court in Obergefell, that expounded on marriage as "the foundation of the family and of society, without which there would be neither civilization or progress." Maynard v. Hill, 125 U.S. 190, 211 (1888). At the time those words were written, the following was true about the institution of marriage. Coverture laws subordinated married women to their husbands' legal control, eliminating their legal and economic identities. Christopher R. Leslie, Dissenting from History: The False Narratives of the Obergefell Dissents, 92 Ind. L.J. 1007, 1014 (2017). As a result, a married woman's

---

[3] See Wis. Stat. § 48.01(1)(gg).

property, earnings, and labor automatically belonged to her husband. Id. In addition, there was no legal recourse for a married woman whose husband had sexually assaulted her, which would be true well into the 1970s in many states. Id. at 1015. And neither married women nor unmarried women had the right to vote, to exercise civic influence in order to right these wrongs. Furthermore, marriage was limited exclusively to heterosexual relationships. And, marriages between people of differing races and ethnicities were widely banned. In short, if marriage was the foundation of the family and of society in 1888, there was something rotten at the core of that foundation.

¶71 Times have changed, of course, but the justification that marriage is the moral core of society and the family is as weak as it ever was. With only about half of U.S. adults in a marriage, first marriages beginning later in life, and increasing divorce rates over time, Americans are spending more and more of their adult lives unmarried.[4] Unsurprisingly then,

---

[4] See Gretchen Livingston, The Changing Profile of Unmarried Parents, Pew Research Center (Apr. 25, 2018), https://perma.cc/RC6T-NFGE ("The growth in unmarried parenthood overall has been driven by several demographic trends. Perhaps most important has been the decline in the share of people overall who are married. In 1970, about seven-in-ten U.S. adults ages 18 and older were married; in 2016, that share stood at 50%. Both delays in marriage and long-term increases in divorce have fueled this trend. In 1968, the median age at first marriage for men was 23 and for women it was 21. In 2017, the median age at first marriage was 30 for men and 27 for women. At the same time, marriages are more likely to end in divorce now than they were almost half a century ago. For instance, among men whose first marriage began in the late 1980s, about 76% were still in those marriages 10 years later, while this figure was 88% for men whose marriages began in the late 1950s.").

6

nearly one third of children live in a single-parent home. Pearce et al., supra, at 592. Yet many Americans still desire to create families. Functional, stable families continue to form as alternative family structures proliferate and garner greater societal acceptance. See Frank F. Furstenberg et al., Kinship Practices Among Alternative Family Forms in Western Industrialized Societies, 82 J. Marriage Fam. 1403 (2020). The notion that marriage serves as the foundation of society is at best outdated, and at worst misogynistic. It provides scant justification for laws that distinguish based on marital status.

¶72 In sum, I agree that the adoption statutes have a rational basis given the low bar that the legal analysis requires. But upon closer inspection, the connection between the adoption statutes and a child's best interest appears increasingly threadbare. Remove the outdated, the questionable, and the merely self-perpetuating, and soon you are left with very little connection at all.